UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

JOSEPH TACOPINA,

                *Plaintiff,*

        -- against --

BERNARD KERIK, NATHANIEL VINTON,
MICHAEL O'KEEFFE, and THE DAILY
NEWS CORPORATION,

              *Defendants.*

----------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
FEB 05 2014
U.S.D.C. S.D. N.Y.
CASHIERS

14 CV 749

      Plaintiff Joseph Tacopina ("Tacopina"), by his attorneys, Judd Burstein,

P.C., complaining of the Defendants, alleges:

## INTRODUCTION

     1.     This case presents a unique and outrageous set of facts: a conspiracy

between two unethical newspaper reporters, Nathanial Vinton ("Vinton") and

Michael O'Keeffe ("O'Keeffe"), and a convicted felon and liar, Bernard Kerik

("Kerik") to defame an attorney, Plaintiff Tacopina, by filing a fraudulent

disciplinary complaint against Tacopina so that the New York Daily News ("Daily

News") could publish an article describing the allegations. The article contains

numerous factually inaccurate statements and falsely implies that Tacopina

engaged in unethical conduct and is an unethical attorney.

2.     Vinton and O'Keeffe are two reporters who are obsessed with ridding the sports world of performance enhancing drugs ("PEDs"). This is an admirable goal, and it would be wholly appropriate for them to pursue as journalists if they were opinion columnists. But they are not opinion columnists; they are reporters who purport to accurately and dispassionately report facts. Time and again over the past few years, they have slanted the news to write negative articles about athletes accused of using PEDs.

3.     Vinton and O'Keeffe have reached a new low in their coverage of the New York Yankee third baseman Alex Rodriguez's ("Rodriguez") dispute with Major League Baseball ("MLB") over alleged PED use by Rodriguez. In addition to obviously slanting the vast majority of their stories in favor of MLB, they made a decision to discredit Tacopina with factually inaccurate allegations because, as Rodriguez's attorney, he sought publicly to challenge the *bona fides* and integrity of MLB's conduct vis a vis Rodriguez. Vinton and O'Keeffe found a willing partner for this endeavor in Kerik.

4.     Vinton, O'Keeffe and Kerik had a united interest, based upon different motives, to publish knowingly false facts about Tacopina. Kerik wanted to rehabilitate himself by blaming all of his criminal convictions for corruption and fraud on Tacopina, who once served as his attorney. As noted above, O'Keeffe and Vinton were motivated by their desire to help MLB, although Plaintiff does

2

not allege at this time that MLB was part of the Defendants' scheme.  In furtherance of this goal, on information and belief, they enlisted Kerik, a source they knew was completely unreliable and a convicted fraudster, to make false allegations about Tacopina's past representation of him – allegations that date back almost seven years or more.

5.     On information and belief, having concluded that publishing knowingly false allegations by Kerik against Tacopina (detailed below) would subject the Defendants herein to a defamation suit, Vinton, O'Keeffe and Kerik agreed that Kerik would file a frivolous disciplinary complaint against Tacopina, to be followed by Vinton and O'Keeffe publishing a lengthy story that "reported" on the complaint.  This is precisely what happened, resulting in a defamatory article written by O'Keeffe and Vinton and published in the Daily News on December 28, 2013.  (Exhibit A hereto)

6.     In hatching their clever, but corrupt plan, (a) Kerik believed that he would be insulated from liability by reason of New York's recognition of a privilege for statements made in judicial and quasi-judicial proceedings ("litigation privilege"), and (b) Vinton and O'Keeffe believed that, in reporting on the contents of documents filed by Kerik in an actual disciplinary proceeding, they would be protected by the privilege set forth in New York Civil Rights Law § 74.

7.     **Significantly, on two occasions O'Keeffe has admitted in effect that he and Vinton engineered Kerik's filing of a disciplinary complaint so that they could publish a negative article about Tacopina.**

8.     As of December 26, 2013, after a considerable period of time, Tacopina's lawyer, Lanny Davis ("Davis"), believed that a threatened negative piece on Tacopina would not be published because O'Keeffe, Vinton and their superiors had heeded Davis's threats of a defamation action if they published uncorroborated defamatory claims against Tacopina based upon an "anonymous source." Davis had repeatedly stated to O'Keeffe and Kerik that they were mistaken if they believed that they would be able to rely upon the journalist's privilege to hide their source. Davis made it clear that he had no doubt the source was Kerik, and that Kerik, O'Keeffe, Vinton, and the Daily News would be sued for defamation.

9.     Out of the blue on December 26, 2013, O'Keeffe called Davis, informing him that he and Vinton were going to run with their negative Tacopina story, and that they had a hard deadline of the next morning. The deadline of the next morning meant that O'Keeffe and Vinton planned to post their story on the Daily News's web site later that day, December 27, 2013. Davis again threatened litigation if O'Keeffe and Vinton ran with the story based upon an uncorroborated

4

anonymous source who was surely Kerik. After Davis's threat, O'Keeffe's and Vinton's deadline slipped away.

10.    However, two days later, on the morning of December 28, 2013, O'Keeffe called Davis to inform him that Kerik had just filed a disciplinary complaint against Tacopina, and that he and Vinton were writing a story about it. Significantly, Tacopina or Davis had previously made the point to O'Keeffe and Vinton that the absence of a disciplinary complaint against Tacopina was compelling evidence that the allegations against Tacopina were false. Plainly, either Tacopina or Davis had inadvertently provided O'Keeffe and Vinton with a potential solution to the dangers posed by publishing their story as originally planned. Put simply, if Kerik filed a disciplinary complaint, he could now become an on-the-record source via his statements in his complaint – statements that they believed would be protected by the litigation privilege.

11.    Davis confronted O'Keeffe, stating, in words and substance: "What a coincidence that after the story seemed dead, Kerik filed an ethics complaint at the 11th hour 59th minute during the Christmas break." Davis asked him if he had coordinated this strategy with Kerik. Incredibly, O'Keeffe did not deny Kerik's implicit accusation – something that he surely would have done if he and Vinton were innocent. Instead, he paused, and stated: "**I don't reveal our sources and tactics.**"

12.     On January 24, 2014, O'Keeffe spoke with Tacopina's current counsel.  In response to counsel's accusation that O'Keeffe and Vinton had been irresponsible in relying upon Kerik, **O'Keeffe snickered and said, in words and substance: "We did not do that.  We merely reported about a Bar complaint that Kerik filed."**

13.     Kerik, Vinton and O'Keeffe were wrong.   Neither the litigation privilege nor Civil Rights Law § 74 protect people from purposefully, and in bad faith, engineering a situation where they may assert these privileges to protect themselves from the consequences of making statements they know to be defamatory.  On information and belief, Defendants conspired to file a meritless disciplinary complaint with the sole purpose of defaming Tacopina in subsequent publications.  This conduct prevents Defendants from claiming the publications at issue are privileged.

## **JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

15.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2) or, alternatively, 28 U.S.C. § 1391(b)(3).

6

## PARTIES

16.     Tacopina is an attorney licensed to practice law in the State of New York.  He is a citizen of the State of Connecticut.

17.     Kerik is a citizen of the State of New Jersey.  He is a convicted felon, having pled guilty to making false statements to the government in an effort to secure the position of Secretary of Homeland Security and to committing tax fraud.

18.     On information and belief, Defendant Vinton is a citizen of either the State of New York or the State of Massachusetts.

19.     On information and belief, Defendant O'Keeffe is a citizen of the State of New York.

20.     New York Daily News Company is a corporation organized under the laws of the State of New York, with its principal place of business located in the County of New York, New York.

## VINTON'S AND O'KEEFFE'S DECISION TO HARM TACOPINA

21.     In August of 2013, Commissioner of MLB Bud Selig announced that, based upon allegations of PED use by Rodriguez, he was suspending Rodriguez for 211 games.

22.     Rodriguez retained Tacopina as his lead counsel for the purposes of challenging the suspension.  Thereafter, Tacopina very publicly alleged that MLB

had acted unethically and illegally in its dealings with witnesses against Rodriguez – particularly Anthony Bosch, MLB's key witness.

23.   On information and belief, in the face of Tacopina's allegations, which cast doubt upon MLB's case against Rodriguez and which, according to the December 28, 2013 Daily News article at issue in this case, were beginning "to get traction," O'Keeffe and Vinton decided to investigate Tacopina in the hope of discrediting him. This was an extraordinary step by Vinton and O'Keeffe because there had been no allegations of any impropriety by Tacopina in his representation of Rodriguez. It is virtually unheard of for reporters to start investigating a lawyer who is merely representing a client for the purpose of writing a negative article.

24.   That Vinton and O'Keeffe were seeking to write a "hit piece" on Tacopina is confirmed by the fact that, since they began working on the story in late September or early October of 2013, no colleague or friend of Tacopina ever reported to Tacopina that a reporter from the Daily News had called seeking his or her opinion of Tacopina's talents as a lawyer. Plainly, those are the questions that a reporter seeking to write a profile would ask, and if such questions were asked of any colleague or friend, Tacopina would surely have been informed by the person interviewed.

25.   The first problem for Vinton and O'Keeffe in executing their plan to destroy Tacopina's reputation was that Tacopina has a spotless record during his

8

22 year career as a lawyer in terms of ethics complaints or lawsuits against him. Tacopina has never been disciplined as an attorney and, other than a case involving an automobile accident, has only been sued twice based upon his acting as a lawyer. Both of those cases were dismissed with prejudice

26.    Accordingly, Vinton and O'Keeffe looked elsewhere. On information and belief, Vinton and O'Keeffe turned to Kerik to provide false information to injure Tacopina's reputation.   By that time, Kerik had already demonstrated a tendency to make false statements about past events to better his perceived position and reputation. And, Kerik had previously made non-detailed claims that he had been victimized by Tacopina.

27.    On information and belief, based upon questions that O'Keeffe and Vinton started asking Tacopina in late September or October of 2013, they had already spoken with Kerik by the time they started reaching out to Tacopina and Davis.  The source of this information and belief is that many of the questions asked of Tacopina by O'Keeffe and Vinton were either (a) related to Kerik's 2007 federal case and were plainly based upon false claims made by Kerik or (b) involved allegations concerning alleged personal, private dealings between Kerik and Tacopina that no one other than Kerik could have made.  Nonetheless, Vinton and O'Keeffe falsely insisted that they had a number of anonymous sources for

their questions about Kerik.  In fact, on information and belief, Kerik was the sole source of the allegations at issue in this case.

## SCOPE OF THIS LAWSUIT

28.    On information and belief, Kerik has made a host of defamatory statements to O'Keeffe and Vinton about Tacopina that Kerik had actual knowledge were false.    However, at this point, this action focuses on two defamatory statements made by Kerik, and published by O'Keeffe, Vinton and the Daily News.  With respect to these two defamatory statements, documentary evidence establishes that the Defendants either had actual knowledge that the statement was factually inaccurate or acted in reckless disregard of the truth. Discovery will reveal whether other false statements were made by Kerik and/or published by O'Keeffe, Vinton and the Daily News with actual knowledge that such statements were factually inaccurate or in reckless disregard for the truth.

## KERIK'S DEFAMATION OF TACOPINA

29.    At issue in this litigation are two false statements made by Kerik with actual knowledge of their falsity; and, subsequently published by O'Keeffe, Vinton, and the Daily News as part of a conspiracy with Kerik even though they knew the statements were factually inaccurate and/or acted with reckless disregard.

30.    **First,** Kerik claimed that Tacopina disclosed his privileged communications with Kerik to Kerik's prosecutors at the United States Attorney's

Office for the Southern District of New York ("USAO").   Kerik had actual knowledge that this claim was false, as demonstrated by a January 23, 2008 decision in Kerik's 2007 federal case by Honorable Stephen C. Robinson. (Exhibit B hereto)  In that decision, Judge Robinson explicitly found that the statements made by Tacopina to the USAO "cannot be considered confidential and privileged."  (Exhibit B, at p. 10-11)   Thereafter, on May 14, 2009, Judge Robinson held that "Kerik has failed to identify, or even allege, new evidence that the Government engaged in some impermissible practice which might warrant further discovery (*e.g.*, asking Mr. Tacopina to disclose privileged client confidences)." (Exhibit C hereto, at p. 27)

31.   **Second**, Kerik falsely claimed that, in the spring of 2007, Tacopina had hid from him the fact that he had received a March 12, 2007 subpoena from the USAO.  There is documentary proof demonstrating that this statement is false. For example, on March 13, 2007, the day after Tacopina was served with the subpoena, Kerik and Tacopina discussed the subpoena in an email.  In March of 2007, Kenneth Breen ("Breen"), Tacopina's co-counsel, sent an email to Kerik and Tacopina enclosing a letter that Breen proposed to send to the USAO about, *inter alia*, the subpoena served upon Tacopina.  Most significantly, the final version of this letter is a matter of public record, having been annexed as "Exhibit C" to a December 7, 2007 declaration filed in Kerik's case by Breen.  (Exhibit D hereto)

11

32.     Both of these statements were instances of defamation *per se* because they tended to injure Tacopina in his profession.   A lawyer's unauthorized disclosure of privileged information is a violation of Rule 1.6 of the New York Rules of Professional Conduct, and a lawyer's failure to alert his or her client that he or she had been subpoenaed by prosecutors violates Rule 1.4 of those same Rules.  Either or both of these allegations would be devastating to any criminal defense lawyer because a prospective client is not likely to hire a lawyer who has disclosed privileged information or gone behind another client's back to speak to prosecutors about that client.

## VINTON'S AND O'KEEFFE'S ACTUAL KNOWLEDGE OF FALSITY OR THEIR RECKLESS DISREGARD FOR THE TRUTH

33.     O'Keeffe and Vinton either had actual knowledge that the statements alleged above in Paragraphs 30 and 31 were factually inaccurate, or they acted with reckless disregard for the truth.

34.     This conclusion is inescapable in light of the fact that they claimed in their December 28, 2013 article about Kerik's disciplinary complaint that the Daily News had "reviewed … thousands of pages of court records" from the Kerik case. More importantly, their article admitted that they had reviewed the very documents that prove the falsity of Kerik's statements.

35.     With respect to the issue of Tacopina's supposed disclosure of confidential information to the USAO, the article specifically referred to Judge Robinson's January 2008 decision, in which he explicitly held that Tacopina had not disclosed privileged communications to the USAO: "[A]fter a lengthy legal skirmish, U.S. District Court Judge Stephen Robinson sided with prosecutors, barring Breen from defending Kerik." Moreover, both of Judge Robinson's decisions about the privilege issue were available for public review on the ECF website of the United States District Court for the Southern District of New York ("ECF").

36.     As for the claim that Tacopina had hidden from Kerik the fact that he had received a grand jury subpoena, that claim was refuted by Breen's December 7, 2007 Declaration, which, as noted above, annexed a March 2007 letter from Breen to the USAO concerning the subpoena served upon Tacopina. Vinton and O'Keeffe surely knew about this letter because Breen's Declaration was submitted in opposition to the USAO's motion to disqualify Breen – *i.e.*, part of the "lengthy legal skirmish" referenced in O'Keeffe's and Vinton's December 28, 2013 article.

37.     Given these facts, O'Keeffe and Vinton surely knew that Kerik's statements were factually inaccurate. And if they did not have actual knowledge, they acted in disregard for the truth because (a) they had all of the court records from Kerik's 2007 case available to them on ECF, (b) by their own admission, they

or their colleagues had reviewed "thousands of pages" in the court file, and (c) their own December 28, 2013 article referenced the very disqualification dispute that had given rise to the filing of the documents that demonstrate the falsity of Kerik's statements. Moreover, on information and belief, O'Keeffe and Vinton never interviewed Breen with respect to the claim that Kerik was unaware that Tacopina had been subpoenaed. Had they done so, Breen surely would have denied that allegation because it is factually inaccurate.

38.    That Vinton and O'Keeffe either knew the truth or were reckless with it is corroborated by the obvious bias against Tacopina exhibited in their December 28, 2013 article about Kerik's disciplinary complaint. The overall gist of the article, by its tone, tenor, and context, falsely states and implies that Tacopina is an unethical attorney and engaged in conduct that violates his ethical responsibilities.

39.    On the one hand, O'Keeffe and Vinton promoted Kerik as a trustworthy and credible source for factual information. O'Keeffe and Vinton ignored Kerik's convictions, and instead described him as "a 9/11 hero and one of the most decorated police commissioners in New York City history." This is an incredible claim that shows that O'Keeffe's and Vinton's goal was to destroy Tacopina by falsely enhancing Kerik's reputation. Whereas they were now praising Kerik to the moon as a "9/11 hero," on March 14, 2005, their own paper, the Daily News, revealed that "Former Police Commissioner Bernard Kerik

14

accepted thousands of dollars in royalties from a book published to raise money for the families of heroes killed on Sept. 11, 2001," and also reported that "Kerik had helped his brother and a close friend get jobs with a city contractor who was battling allegations that his company was mob controlled."

40.     Indeed, even though the Daily News had won a Pulitzer Prize for the investigation that brought about Kerik's demise, O'Keeffe and Vinton dishonestly ignored the significance of Kerik's guilty plea under oath by stating that Kerik had pleaded guilty only because Judge Robinson had indicated Kerik's post-Breen counsel might be disqualified. This was a flat-out lie, easily demonstrated by the ECF docket in Kerik's case. It shows that, on March 18, 2008, Barry Berke, one of New York's most prominent and talented criminal defense attorneys, substituted for Breen as Kerik's counsel. The ECF docket does not contain a hint of any potential disqualification of Berke. Indeed, it shows the direct opposite, as Berke was still counsel for Kerik on October 26, 2009, when Judge Robinson scheduled trial for November 9, 2009 (Kerik ended up pleading guilty on November 5, 2009). As experienced journalists, O'Keeffe and Vinton knew or should have known that a judge would not set a trial date for two weeks later if there were any chance that the defendant's counsel would be disqualified. Plainly O'Keeffe and Vinton never sought to speak with Berke, who surely would have put the lie to Kerik's claim that he pleaded guilty out of concern that Berke would be disqualified.

41.     Further, notwithstanding their claim that they and their colleagues reviewed thousands of pages of court records, Vinton and O'Keeffe failed to mention in their story the pre-sentence letter (Exhibit E hereto) in which Kerik stated:

> I fully recognize and so deeply regret, on multiple occasions ... **I committed the crimes to which I have admitted** and for which I humbly stand before the Court for sentencing.
>
> I acknowledge and accept responsibility for the dishonor that my violations of the criminal laws of this county have brought on ... the public positions I once held.... **This country and other officials ... placed the greatest trust – the public trust – in me.  I betrayed that trust ... and I am deeply sorry for and genuinely ashamed of what I did**

(Emphasis supplied)

42.     Moreover, O'Keefe and Vinton ignored the sentencing memorandum submitted by Kerik which stated, *inter alia*, that (a) "Mr. Kerik has been tormented by the daily guilt and remorse for his actions"; (b) "Mr. Kerik, age 54, has directly and explicitly acknowledged his responsibility for his criminal acts"; (c) "Mr. Kerik fully recognizes and acknowledges that the offenses to which he pleaded guilty are extremely serious," and (d) most significantly, that Mr. Kerik "fully accepts that he is deserving of serious punishment."

43.     It is astounding and outrageous that Vinton and O'Keeffe, with their colleagues, having reviewed the ECF docket on which Kerik's letter and his

16

sentencing memo are listed, published Kerik's unsupported and uncorroborated false claim that he was not in fact guilty, but had only pleaded guilty because of some unverified threat that his lawyer might be disqualified – all the while intentionally choosing not to print the contrary actual statements that Kerik, both individually and through his attorney, had made after he pled guilty.

44.     On the other hand, Vinton and O'Keeffe went out of their way to cast Tacopina in a negative light.  In the December 28, 2013 article, O'Keeffe and Vinton launched multiple personal attacks upon Tacopina even though they were purporting to provide readers factual information.  For example they wrote that Tacopina and the lawyers working with him had "launched a cartoonish barrage of litigation" against MLB.  They also wrote that "[a]s in the Kerik case, a hollow declaration of righteousness was Tacopina's short-term solution, winning the lawyer a brief star turn but leaving the client with lighter pockets and the prospect of further litigation."   These statements falsely implied that Tacopina filed meritless claims that were not in his clients' best interest, which contributed to O'Keeffe's and Vinton's portrayal of Tacopina as unethical.

45.     In addition, the article intentionally presented the facts in a wholly misleading, negative manner.  For example, the article makes much of the fact that Tacopina was on the prosecution's November 15, 2007 witness list in Kerik's federal case, making a point of the fact that no other lawyer who had represented

17

Kerik was found on the list.   This claim was completely misleading because O'Keeffe and Vinton knew, as shown by the very article that they wrote, that Breen had been disqualified from representing Kerik because the prosecution wanted to call Breen as a trial witness.   O'Keeffe and Vinton published this false fact about Tacopina because, as with other false statements, it falsely implied improper or suspicious conduct on Tacopina's part.

46.   One other particularly outrageous conduct also evidences O'Keeffe's and Vinton's bad faith.   On January 23, 2014, Kerik brought a frivolous malpractice action against Tacopina.   Although he surely had a copy of Kerik's complaint hours earlier, O'Keeffe denied Tacopina an opportunity to respond publicly to the suit by waiting until 11:17 p.m. on January 23 to leave a voicemail stating: "Hey, listen we [O'Keeffe and Vinton] just heard that Bernie [Kerik] filed a lawsuit, a malpractice lawsuit against you in federal court. And wanted to talk to you about that. We're gonna do a story for tomorrow's paper. So, give me a call, if you'd like to comment." **This was a flat-out lie by O'Keeffe**, as demonstrated by the fact that he and Vinton filed a highly detailed internet story about Kerik's complaint – essentially the same story that appeared in print the next morning – less than one hour later, at 12:02 a.m., on January 24.

## THE CONSPIRACY

47.     There were two crucial impediments to O'Keeffe's and Vinton's goal of harming Tacopina's reputation: the fact that they were faced with uncorroborated claims by a convicted liar, and the fact that those claims were contradicted by court records.   Worse still, on information and belief, Kerik refused to speak on the record.   In addition, Tacopina had vehemently denied Kerik's allegations and had threatened litigation.   Hence, as desperate as Kerik was to seek to rehabilitate himself by blaming his troubles on Tacopina, and as desperate as O'Keeffe and Vinton were to write a negative article about Tacopina, Vinton and O'Keeffe knew from Davis's threats that they and Kerik likely would be sued if they simply published Kerik's allegations – particularly if they referred to Kerik as an "anonymous source."   Further, on information and belief, O'Keeffe's and Vinton's superiors at the Daily News had told them they could not publish their story using Kerik as an uncorroborated anonymous source.

48.     On information and belief, hoping to publish their attack on Tacopina while attempting to insulate themselves from a lawsuit, Kerik, O'Keeffe and Vinton seized upon a plan that, they believed, would allow O'Keeffe and Vinton to print Kerik's false allegations, while insulating themselves from a defamation suit.

49.     Davis or Tacopina had previously made the point to O'Keeffe and Vinton that Kerik's allegations could not be reconciled with the fact that Tacopina

had never been disciplined and that if Kerik had ever made his allegations in a disciplinary complaint, Tacopina would have been sanctioned. Thereafter, once O'Keeffe, Vinton and their superiors at the Daily News concluded that it was too dangerous to publish Kerik's uncorroborated false allegations as based on an anonymous source, O'Keeffe and Vinton realized that Tacopina's or Davis's point about the absence of a disciplinary complaint could be used to their advantage. Thus, Kerik, after waiting almost seven years to do so, suddenly filed a disciplinary complaint against Tacopina. In doing so, Kerik, O'Keeffe and Vinton wrongly believed that Kerik would be protected from a defamation suit by reason of the litigation privilege, and O'Keeffe and Vinton would be able to write what they knew to be false, wrongly believing that their article would be protected by Civil Rights Law § 74.

50. On information and belief, O'Keeffe and Vinton agreed with Kerik that if he filed a disciplinary complaint against Tacopina, they would publish their defamatory attack on Tacopina with Kerik being able to come out from the shadows. O'Keeffe and Vinton conspired with Kerik to file the meritless disciplinary complaint so they could subsequently defame Tacopina in their articles. The sources of this information and belief include (a) as alleged above in Paragraphs 4-7, 23-27 and 44-46, O'Keeffe's and Vinton's overwhelming and irrational bias against Tacopina and in favor of Kerik; (b) as alleged above in

Paragraphs 8-10, in the face of Davis's December 26 threats, O'Keeffe's and Vinton's December 27 deadline evaporated and Kerik filed his disciplinary complaint almost immediately after Davis made his final threat to O'Keeffe and Vinton; (c) O'Keeffe's and Vinton's December 28, 2013 article, published the day after Kerik filed his disciplinary complaint, contained, as detailed above in Paragraphs 38-40, demonstrably false allegations that no responsible newspaper would allow a reporter to file in the absence of a claim of privilege; (d) as alleged above in Paragraphs 33-37, 41 and 42, Vinton and O'Keeffe surely knew that the allegations complained of in this action were false because they or their colleagues had reviewed the ECF docket from Kerik's case and therefore had seen the documentary evidence showing that Kerik had lied to them; and (e) as alleged above in Paragraphs 11 and 12, O'Keeffe has in effect admitted his conspiracy with Kerik and Vinton by (i) stating "**I don't reveal our sources and <u>tactics</u>**," in response to Davis's implcit accusation that they had convinced Kerik to file his complaint, and (ii) stating to Kerik's current counsel on January 24, 2014 that he and Vinton did not take Kerik at his word, but instead merely reported about "a Bar complaint that Kerik filed."

51.     Once O'Keeffe and Vinton induced Kerik to file a meritless disciplinary complaint, it was used as a "hook" to publish the very allegations that O'Keeffe and Vinton would not have otherwise published.  On information and

belief, the Daily News published the December 28, 2013 article knowing that O'Keeffe and Vinton had induced Kerik to file his disciplinary complaint. Further, the Daily News, through O'Keeffe and Vinton, knew the December 28 article included factually inaccurate statements and implied false facts about Tacopina in order to harm Tacopina's reputation or acted with reckless disregard for the truth when publishing the December 28 article.

## FIRST CLAIM FOR RELIEF

### (Defamation against Kerik)

52.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 51 above as if fully restated here.

53.    Kerik's statement that Tacopina had disclosed privileged information to the USAO was false.

54.    Kerik had actual knowledge that Tacopina in fact had not disclosed privileged information to the USAO.

55.    Kerik published his false statement that Tacopina had disclosed privileged information to the USAO to O'Keeffe and Vinton with the intent that it appear in the Daily News.

56.    Kerik's disciplinary complaint containing the statement that Tacopina had disclosed privileged information to the USAO is not privileged because the disciplinary complaint was maliciously filed for the sole purpose of defaming

Tacopina and permitting O'Keeffe and Vinton to publish false statements to defame Tacopina.

57. Kerik's statement that Tacopina had disclosed privileged information to the USAO was defamation *per se* because it tended to injure Tacopina in his profession.

58. Tacopina has been injured by Kerik's statement that Tacopina had disclosed privileged information to the USAO in an amount to be determined at trial, but in no event less than $1 million.

59. In addition, because Kerik's defamation was wilful wanton and malicious, Tacopina should be awarded punitive damages as determined at trial, but in no event less than $4,000,000.

## SECOND CLAIM FOR RELIEF

### (Defamation against Kerik)

60. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 51 above as if fully restated here.

61. Kerik's statement that Tacopina had failed to disclose to him that he had been subpoenaed by the USAO was false.

62. Kerik had actual knowledge that Tacopina had, in fact, disclosed to him that he had been subpoenaed by the USAO as early as the day after Tacopina had been served with the subpoena.

63.   Kerik published his false statement that Tacopina had failed to disclose to him that he had been subpoenaed by the USAO to O'Keeffe and Vinton with the intent that it appear in the Daily News.

64.   Kerik's disciplinary complaint containing the statement that Tacopina had disclosed privileged information to the USAO is not privileged because the disciplinary complaint was maliciously filed for the sole purpose of defaming Tacopina and permitting O'Keeffe and Vinton to publish false statements to defame Tacopina.

65.   Kerik's statement that Tacopina had failed to disclose to him that he had been subpoenaed by the United States was defamation *per se* because it tended to injure Tacopina in his profession.

66.   Tacopina has been injured by Kerik's statement that Tacopina had failed to disclose to him that he had been subpoenaed by the USAO in an amount to be determined at trial, but in no event less than $1 million.

67.   In addition, because Kerik's defamation was wilful wanton and malicious, Tacopina should be awarded punitive damages as determined at trial, but in no event less than $4,000,000.

## THIRD CLAIM FOR RELIEF

### (Defamation against Vinton, O'Keeffe and the
### New York Daily News Company)

68.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 51 above as if fully restated here.

69.    Kerik's statement that Tacopina had disclosed privileged information to the USAO was false.

70.    O'Keeffe, Vinton and NYDNC (collectively "NYDNC") either had actual knowledge that Tacopina in fact had not disclosed privileged information to the USAO, or acted with reckless disregard for the truth.

71.    NYDNC published Kerik's false statement that Tacopina had disclosed privileged information to the USAO in the Daily News.

72.    NYDNC reporting that Tacopina had disclosed privileged information to the USAO is not privileged because (1) O'Keeffe and Vinton conspired with Kerik to file the meritless disciplinary report for the sole purpose of defaming Tacopina, (2) the December 28 article contains false facts and implications beyond those included in Kerik's complaint, and (3) the overall tone and tenor of December 28 article implied unethical conduct by Tacopina beyond the conduct alleged in Kerik's complaint.  Further, the tone and tenor of the December 28

25

article lent credibility to Kerik's factually inaccurate statements in a manner designed to harm Tacopina's reputation.

73.   NYDNC's publication of Kerik's false claim that Tacopina had disclosed privileged information to the USAO was defamation *per se* because it tended to injure Tacopina in his profession.

74.   Tacopina has been injured by NYDNC's publication of Kerik's statement that Tacopina had disclosed privileged information to the USAO in an amount to be determined at trial, but in no event less than $1 million.

75.   In addition, because NYDNC's conduct was wilful wanton and malicious, Tacopina should be awarded punitive damages as determined at trial, but in no event less than $9,000,000.

## FOURTH CLAIM FOR RELIEF

### (Defamation against Vinton, O'Keeffe and NYDNC)

76.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 51 above as if fully restated here.

77.   Kerik's statement that Tacopina had failed to disclose to him that he had been subpoenaed by the USAO was false.

78.   NYDNC either had actual knowledge of the falsity of Kerik's statement that Tacopina had failed to disclose to him that he had been subpoenaed by the USAO, or acted with reckless disregard for the truth.

79.     NYDNC published Kerik's false statement that Tacopina had failed to disclose to him that he had been subpoenaed by the USAO in the Daily News.

80.     NYDNC's reporting that Tacopina had failed to disclose to Kerik that he had been subpoenaed by the USAO is not privileged because (1) O'Keeffe and Vinton conspired with Kerik to file the meritless disciplinary report for the sole purpose of defaming Tacopina, (2) the December 28 article contains false facts and implications beyond those included in Kerik's complaint, and (3) the overall tone and tenor of December 28 article implied unethical conduct by Tacopina beyond the conduct alleged in Kerik's complaint.   Further, the tone and tenor of the December 28 article lent credibility to Kerik's factually inaccurate statements in a manner designed to harm Tacopina's reputation.

81.     NYDNC's publication of Kerik's false claim that Tacopina had failed to disclose to him that he had been subpoenaed by the USAO was defamation *per se* because it tended to injure Tacopina in his profession.

82.     Tacopina has been injured by NYDNC's publication of Kerik's statement that Tacopina had failed to disclose to him that he had been subpoenaed by the USAO in an amount to be determined at trial, but in no event less than $1 million.

83.    In addition, because NYDNC's conduct was wilful wanton and malicious, Tacopina should be awarded punitive damages as determined at trial, but in no event less than $9,000,000.

**WHEREFORE**, on information and belief, Plaintiff demands judgment as follows:

A.    On Plaintiff's First and Second Claims for Relief, an award of compensatory damages against Kerik as determined at trial, but in no event less than $1,000,000;

B.    On Plaintiff's First and Second Claims for Relief, an award of punitive damages against Kerik as determined at trial, but in no event less than $4,000,000;

C.    On Plaintiff's Third and Fourth Claims for Relief, an award of compensatory damages against O'Keeffe, Vinton and New York Daily News Company, joint and severally, as determined at trial, but in no event less than $1,000,000;

D.    On Plaintiff's Third and Fourth Claims for Relief, an award of punitive damages against O'Keeffe, Vinton, and New York Daily News Company, joint and severally, as determined at trial, but in no event less than $9,000,000;

E.    An award of the costs and disbursements of this action; and

F.    An Order granting such other and further relief as deemed just and

proper by this Court.

Dated: New York, New York
       February 5, 2014

                                        JUDD BURSTEIN, P.C.

                                        By_____
                                        Judd Burstein (JB-9585)
                                        1790 Broadway
                                        New York, New York 10019
                                        (212) 974-2400
                                        (212) 974-2944 (Fax)
                                        jburstein@burlaw.com

# EXHIBIT A

Case 1:14-cv-00749-NTS Document 2 Filed 02/05/14 Page 31 of 98

## DAILY NEWS

LOCAL

# Bernard Kerik, the disgraced former NYPD commissioner, accuses attorney Joe Tacopina of fraud, deceit, misrepresentation and list of other legal abuses

**Kerik files complaint before the disciplinary committee of the New York Supreme Court, Appellate Division for the First Judicial Department. Tacopina adamantly denies going rogue on his client**

BY TERI THOMPSON , MICHAEL O'KEEFFE AND NATHANIEL VINTON / NEW YORK DAILY NEWS
SATURDAY, DECEMBER 28, 2013, 9:35 PM



ENID ALVAREZ/NEW YORK DAILY NEWS
Former NYPD Commissioner Bernard Kerik (l.) accuses his former attorney Joe Tacopina (r.) of fraud and misrepresentation.

Long before spearheading Alex Rodriguez's cutthroat campaign to beat a steroid rap, attorney Joe Tacopina stood on the Bronx courthouse steps beside another fallen New York star — ex-NYPD Commissioner Bernard Kerik.

It was June 30, 2006, and Kerik had just pleaded guilty to two misdemeanor charges. The former top cop admitted accepting a $165,000 gift of apartment renovations seven years before from an allegedly mob-tied company seeking to do business with the city.

Tacopina assured his client that his legal troubles were over and he was free to focus on his security consulting business in the Middle East.

Privately, Kerik's friends say, Tacopina described the violations this way: "Like pissing on the sidewalk." Two years later, Kerik was federal inmate No. 84888-054, sitting in a Maryland cell and wondering if the slick defense attorney helped the feds put him behind bars.

Kerik, a 9/11 hero and one of the most decorated police commissioners in New York City history, is now a free man looking for answers.

RELATED: A LOOK AT JOE TACOPINA'S CLIENTELE

Kerik, in a bar complaint filed Friday, accused Tacopina of engaging in "conduct involving dishonesty, fraud, deceit, and/or misrepresentation" — along with a list of explosive legal abuses:

Cooperating with federal prosecutors and revealing information crucial to Kerik's defense to the government without informing or receiving consent from his client.

RELATED: KERIK ARGUES FOR PRISON REFORM 'TODAY' SHOW



JEFF BACHNER FOR NEW YORK DAILY NEWS

Kerik spent two years in federal prison after pleading guilty two misdemeanor charges.

Jeopardizing Kerik's freedom by contacting Kerik in late 2007 after his federal indictment in violation of the conditions of his bail.

Attempting to defraud Kerik of a seven-figure finder's fee in a real estate deal.

Kerik, backed by veteran Boston attorney Raymond Mansolillo and Washington-based attorney Athan Tsimpedes, brought the charges before the disciplinary committee of the New York Supreme Court, Appellate Division for the First Judicial Department.

Tacopina adamantly denies going rogue on Kerik or contacting his client after Tacopina's name appeared on a list identifying him as a witness against Kerik on behalf of the government.

"If any of these allegations were true, Mr. Tacopina would have at least been subjected to discipline," said a statement issued by Tacopina's Washington-based attorney, Lanny Davis.

"Yet Mr. Tacopina in 22 years of law practice has never received a bar complaint, let alone any discipline," said a statement issued Saturday to the Daily News. "Mr. Tacopina's spotless record with the bar speaks far louder than the lies and innuendo that are being spread by those with an obvious agenda."

One of the central allegations of Kerik's bar complaint is that Tacopina secretly met with prosecutors and provided information about his longtime friend and business associate that prosecutors later used in their case against Kerik.

RELATED: KERIK BUDDY DODGES PRISON FOR PERJURY



RICHARD HARBUS FOR NEW YORK DAILY NEWS

Frank DiTommaso (l.) beat perjury rap over Kerik renovations, but brother Peter was convicted.

Tacopina denied providing information about Kerik and explained the meetings by saying that he met with prosecutors who worked the Kerik case "once or twice for less than two hours" primarily to authenticate financial records they had subpoenaed pertaining to a fee-sharing probe involving another attorney.

But according to the bar complaint, in March 2007, when the federal probe into Kerik was in full throttle, prosecutors pulled off the rare trick of disqualifying Tacopina from representing Kerik, subpoenaing his business records, interviewing him about Kerik and converting him into a witness against his former client.

Worse, Tacopina may have exposed both himself and Kerik to possible criminal sanctions in late 2007 when, according to the bar complaint, Tacopina violated a court order by contacting Kerik after the lawyer's name appeared on the government witness list.

In any criminal case there are strict guidelines as to how much contact, if any, a person who is targeted for prosecution can make with potential witnesses.

But this was especially true in Kerik's case, with its potential for political explosiveness and the specter of organized crime looming over everything.

Mansolillo, one of Kerik's attorneys, says Tacopina's contact could have had a profound impact on Kerik's legal situation. "It could have put his client in jeopardy," says Mansolillo. "The courts take that seriously. Even indirect contact they take seriously. It has a prejudicial effect on the entire system. It can turn a case upside down."

Case 1:14-cv-00749-LTS   Document 2   Filed 02/05/14   Page 34 of 98

Tacopina denies having contacted Kerik after his name appeared on the witness list that prosecutors issued on Nov. 15, 2007. "Once he learned that his name appeared on the witness list, Mr. Tacopina had no contact with Mr. Kerik, direct or indirect," Davis said on Tacopina's behalf.

According to Mansolillo, Kerik may also file a malpractice suit against Tacopina. "We'll assess the information that we've gleaned and we'll determine which avenue to take," Mansolillo says. "I'm looking into whether any (of Tacopina's representation) had any indirect or direct effect on where Bernie ended up."

RELATED: MLB SENDS LETTER TO A-ROD LAWYER TACOPINA



PETER KRAMER/GETTY IMAGES

Tacopina represented conman Raffaello Follieri (r.), best known for being former boyfriend of actress Anne Hathaway.

At the very least Mansolillo and Tsimpedes want to have records unsealed in Kerik's case to learn more about how and why Tacopina ended up meeting with prosecutors.

A spokesman for the U.S. attorney's office in White Plains, the office that prosecuted Kerik, declined multiple requests to comment on the case.

But among thousands of pages of court records reviewed by The News is a late 2007 affirmation by the lead prosecutor, Elliott Jacobson, that his office questioned Tacopina about Kerik's Bronx plea in the presence of Tacopina's lawyer. The affirmation starkly contradicts Tacopina's claim that the questions and answers conveyed were about something other than the Kerik case.

"You can't talk about things that would lead your client into an ambush," Mansolillo says. "We have information that they did talk. We don't know why. Those questions may have to be revealed by the U.S. attorney. It could go in a lot of directions."

* * *

In two decades defending some of New York's most notorious villains, Joe Tacopina has learned to skillfully manipulate the media, be it landing fawning profiles of himself or carefully timing litigation to maximize its news value.

Major League Baseball learned all that soon after Alex Rodriguez hired Tacopina. Suddenly the story of A-Rod's procurement of banned substances from Biogenesis was overtaken by a sideshow conspiracy theory about the behavior of MLB investigators and the deviousness of Bud Selig.

RELATED: YANKS GM CASHMAN DISPUTES TACOPINA CLAIM THAT TEAM HID MRI RESULTS FROM A-ROD

Tacopina's wild pronouncements about bribery, tax evasion and surveillance began to get traction: He even instigated a fight with another attorney during Rodriguez's arbitration hearing at MLB's plush Park Ave. offices. Meanwhile, the disgraced Yankee's legal team, which includes the law firm Reed Smith, launched a cartoonish barrage of litigation.

Regardless of whether or not Tacopina can get A-Rod's 211-game ban reduced (an arbitrator is expected to rule within the next two weeks), or even tossed, Rodriguez will be shadowed by the farce of his marathon Biogenesis arbitration. As in the Kerik case, a hollow declaration of righteousness was Tacopina's short-term solution, winning the lawyer a brief star turn but leaving the client with lighter pockets and the prospect of further litigation.



ANTHONY DELMUNDO/NEW YORK DAILY NEWS

Tacopina (l.) arrives at Major League Baseball offices with Alex Rodriguez, appealing his suspension.

There is no question that Tacopina ran into deep conflict-of-interest problems soon after steering Kerik into the Bronx admissions. Almost immediately, a federal grand jury was probing Kerik's sworn statements in relation to his vetting by White House officials for the Homeland Security position.

The subpoenas began flying less than three months after the Bronx plea, and in March 2007, one was served on Tacopina. While many court documents remain sealed, others make clear that Tacopina met with prosecutors regarding Kerik and was disqualified from representing him in federal court by early 2007.

When Tacopina went to see the prosecutors he was accompanied by his own counsel, New York legal ethics specialist Michael Ross. According to court papers and the bar complaint, Kerik had no idea that his own lawyer had met with the prosecutors.

Shortly after, Tacopina began filing paperwork in the Southern District of New York recusing himself from every active defense case that might have required him to face off in court against the same office with which he had been voluntarily interviewed.

With Tacopina off his case, Kerik's chief attorney became Ken Breen, a former federal prosecutor whose aversion to media exposure contrasted with Tacopina's headline-grabbing tactics. Breen wrote to prosecutors on March 21, 2007 inquiring about Tacopina's cooperation with the feds and clearly asserting Kerik's attorney-client privilege. Yet on Nov. 8, a grand jury hit Kerik with a 16-count criminal indictment that made it clear the "gift" language in the Bronx plea had opened Kerik to tax issues that only deepened his problems.

Case 1:14-cv-00749-LTS Document 2 Filed 02/05/14 Page 37 of 98

As one lawyer familiar with the case put it, "Look at the timeline. They simply 'walked the box' over to the U.S. Attorney's office."

As soon as the feds indicted Kerik, they set out to disqualify Breen too, based on his having been a party to some of Tacopina's negotiations with Bronx prosecutors, employing a seldom-used exception to the attorney-client privilege that can render the privilege moot when communications between an attorney and client are themselves used to further a crime, tort or fraud.

That "crime-fraud exception" was based on Kerik's alleged misrepresentations to Tacopina about the "gift" in the Bronx renovations that the lawyer passed on to prosecutors, according to court documents filed by the government. But Kerik didn't know the score until Nov. 15, 2007, a week after his indictment, when assistant U.S. Attorney Perry Carbone faxed Breen the government's witness list, along with a warning that contacting any of the potential witnesses on it would violate a court order and Kerik's bail conditions.

RELATED: 'GOLDEN BOY' STAR EYES BERNIE KERIK'S CAREER FOR INSIGHT ON ROLE



MARIELA LOMBARD FOR NEW YORK DAILY NEWS

Attorney Joe Tacopina vigorously denies allegations made by Bernie Kerik that he went rogue on his client.

There were 32 names on the list, and Kerik's heart skipped a beat as Breen read him the one listed as No. 14: Joe Tacopina.

"That was the ultimate betrayal. He considered Joe one of his best friends, like family, and he was his attorney for God's sake," says one of Kerik's friends. "He was stunned when the U.S. prosecutors gave him the witness list and Tacopina's name was on it."

Breen was outraged too, according to Daily News sources, but after a lengthy legal skirmish, U.S. District Court Judge Stephen Robinson sided with prosecutors, barring Breen from defending Kerik. Neither Breen nor any other lawyer for Kerik was among the 32 names on the Nov. 15 witness list viewed by The News. Kerik found new lawyers, but when Judge Robinson indicated they also might be disqualified, Kerik, short on money, threw in the towel on Nov. 5, 2009. Again he pleaded guilty - this time to eight federal felony counts including filing false tax returns, lying about the renovations, and misleading the White House during his Homeland Security vetting.

•••

When Joe Tacopina was interviewed for a profile in the March 2007 issue of GQ magazine, his relationship with Kerik was still intact, and a photo showed the two men hugging, a caption quoting Kerik saying "I love Joe like a brother."

The problem might have been that they were too close: Tacopina's dual role as Kerik's attorney and business partner made it especially dangerous for Kerik when prosecutors subpoenaed Tacopina's business records and found a complex web of transactions between the two men, who had shared Manhattan office facilities and a joint bank account, and had embarked on a business relationship they both thought would bring them seven-figure paydays.

Evidence swept up by prosecutors included records, a source close to Kerik says, from the bank account Tacopina and Kerik had formed to pursue real estate deals - along with bank records that showed each man had deposited $250,000 in the account.

Kerik's bar complaint raises questions about the business arrangements - the bar can consider it a conflict of interest for an attorney to be engaged in business deals with clients.

Tacopina, however, continued to pursue business deals with Kerik and it was during that time that Raffaello Follieri, the smooth-talking con man who was once the boyfriend of Academy Award-winning actress Anne Hathaway, enlisted Tacopina to help him secure financing to develop properties owned by the Catholic Church. Tacopina turned to Kerik, who was then doing consulting work in the Middle East, for assistance, and Kerik delivered Plainfield Asset Management, a Connecticut hedge fund, which agreed to invest $100 million in Follieri's project.

"Under no circumstance should he have been meeting with me or discussing legal matters, including but not limited to, the Bronx case, the federal case, the Follieri real estate venture, or any other business deal for that matter," the complaint says.



'Today' show host Matt Lauer (l.) grills Tacopina on Alex Rodriguez PED scandal.

According to the bar complaint, Tacopina and Kerik had agreed to split a $1.5 million finder's fee for their role in the deal. But Kerik learned in late November 2007 that the structure of the deal with the Follieri Group for a finder's fee was not for $1.5 million but $2.5 million - and did not include Kerik.
Tacopina denied on Saturday that he had an understanding "either verbally or in writing, for Mr. Kerik to be part of any transaction, finder's fee or otherwise, with Follieri," and claimed that Kerik had a separate finder's fee deal with Plainfield.

But email correspondence between Tacopina and representatives of Kerik in December of 2007 shows Tacopina explicitly promising to collect the fee. "Anything I get in this deal, he gets half and I WILL GET THAT FEE from Follieri one way or an other," he writes.
In another email, Tacopina references the "increase I got from Follieri from 1.5mm to 2.5mm occurred after I was told I couldn't speak to BK right now... I am splitting everything with him even addt'l $ I worked into the deal."

The real estate project between Follieri and the now-defunct Plainfield Asset Management ultimately sputtered. In September of 2008, Follieri pleaded guilty in the Southern District to charges of cheating investors. After serving more than four years in prison he was deported to Italy.

•••
The tale of how the eminent New York City criminal defense lawyer Ronald Fischetti became collateral damage in the Kerik saga has been passed around by legal eagles in courtroom hallways and downtown bars for years.

The federal investigators who had pored through Tacopina's business records in the spring and summer of 2007 found tens of thousands of dollars in checks written to cash - $61,000 of which had the initials "RF" written on the memo line. The agents initially suspected that Tacopina was helping Kerik launder money with the help of a former colleague, whose initials happened to be "RF."

But Tacopina, according to sources close to the investigation, told the agents the checks were referral fees for Fischetti, his longtime friend and mentor. Fischetti, Tacopina told the government, preferred to receive cash for sending clients to the young lawyer. (Davis says Tacopina will be able to provide tax documents supporting his claims.)

The same prosecutor who was pursuing Kerik, Elliott Jacobson, led the grand jury probe into Fischetti. Following Tacopina's leads, the government suspected Fischetti had attempted tax evasion and other crimes. They launched an investigation that lasted two and a half years and crippled Fischetti's legal practice.

Fischetti declined to comment when contacted by The News for this story, four years after he was exonerated. But sources say his exhausting battle with prosecutors cost him as much as a third of his practice and nearly blew up a reputation that took decades to build. His colleagues were subpoenaed and questioned, some dragged before the grand jury, and he was obliged to turn away potential clients. The government was reluctant to drop its Fischetti investigation, according to several sources, because Kerik's new lawyers would then raise questions about Tacopina's credibility if they knew he had steered the feds wrong on Fischetti.

The government finally dropped its probe in December 2009, shortly after Kerik entered his guilty plea in White Plains federal court. In a highly unusual move, prosecutors called Fischetti just before Christmas that year to let him know that he had been exonerated.



RON ANTONELLI/NEW YORK DAILY NEWS

Kerik served as top cop under Mayor Giuliani.

Tacopina, meanwhile, continued to practice law as if nothing had happened.

"The guy dances through the raindrops," one source says. "Nothing ever hits him."

***

In October 2012, months before his release from jail, Kerik testified in the Bronx perjury trial of Frank and Peter DiTommaso, the brothers whose Staten Island transfer station permits had led to his undoing. Taking the witness stand, the slimmer, more fit Kerik was almost unrecognizable without his signature mustache.

Kerik was matter-of-fact about his own mistakes, which had seemed far more consequential six years earlier, when the scandal surrounding him had the power to help sabotage the presidential ambitions of his friend and political patron, Rudy Giuliani.

Kerik had been summoned to the stand by the Bronx DA's office, the same office that had accepted his plea in 2006 and kicked the can to the feds. Ironically, the judge forbade Kerik from using the words "organized crime" before the jury, despite how casually the term had been bandied about in his own case.

Kerik's testimony was pivotal in the long trial – and certainly favorable to the defendants. His answers exposed gaping holes in the case the Bronx authorities would have had to bring against him had he not taken the plea deal that Kerik's bar complaint says Joe Tacopina sold him on.

On cross-examination, Frank DiTommaso's attorney, Cathy Fleming, elicited testimony from Kerik that showed how little evidence there was of any quid pro quo in a meeting between her client and city authorities – a meeting Kerik didn't arrange and attended on the invitation of city officials.

Ultimately Frank DiTommaso was acquitted and Peter, who Kerik did not know, was convicted, though that judgment is under appeal. At the very least, Kerik's appearance suggested that Tacopina should have tried a lot harder to force the Bronx DA's hand in 2006.

Now it seems that Tacopina is fighting to the end for his current client, Alex Rodriguez. When a television interviewer asked Tacopina in August what length doping ban his client deserved, the brash attorney said "not a single inning." Since then he has shown no retreat, even in the face of an overwhelming case presented by MLB that A-Rod got doping products from Biogenesis.

Maybe the never-say-die approach serves Rodriguez well, but that doesn't change the fact that Bernard Kerik believes Joe Tacopina gave him phenomenally bad advice. These are questions that the ladies and gentlemen of the New York bar will now consider in due course.

## OTHER STORIES


Why Families Keep Coming Back to Aruba Year After Year
Aruba


Celebrities Who Have Aged the Worst
Ranker


Missouri Supreme Court Hearing Arguments In Case Of Royals Fan...
ThePostGame


Most Dangerous Object in the Office: Supreme Products Pocket...
Wired Magazine


Mead in America: The Modern Drinker's Guide to Old-Fashioned...
Fodor's News


How to Survive a Night in Your Car (and Other Winter Storm Tips)
Allstate Blog

Recommended by

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | 07 Cr. 1027 |
| Plaintiff, | : | |
| | : | MEMORANDUM |
| v. | : | DECISION AND |
| | : | ORDER |
| BERNARD KERIK, | : | |
| Defendant. | : | |

STEPHEN C. ROBINSON, District Judge:

The Constitution of the United States ensures that criminal defendants have

access to effective counsel.  When that counsel is not or can not be effective, however,

the court must balance the defendant's interest against the court's interest in preserving

the integrity and ethical standards of the legal proceedings before it.  In the instant case, it

is impossible for this Court to see how Mr. Breen's representation of the Defendant does

not jeopardize both the Defendant's right to effective assistance of counsel and the

court's need to preserve the integrity of the process.  Therefore, this Court finds that there

is an actual conflict of interest in Mr. Breen's representation of Mr. Kerik.

## I.  Background

The Defendant, Mr. Kerik, was charged in a 16 count indictment on charges

which include accepting payments from a company that sought to do business with the

City of New York, providing false information on a loan application, tax fraud, and

making false statements to the federal government.

According to the Government, after the Defendant's nomination for Secretary of the Department of Homeland Security was withdrawn in December 2004, the Defendant's then-attorney, Joseph Tacopina met with the Bronx County District Attorney's Office ("BCDAO") to discuss its allegations against the Defendant. Mr. Tacopina told the BCDAO that Mr. Kerik paid for all of the renovations to his Riverdale apartment himself, and that Mr. Kerik had taken a loan from a Manhattan realtor in order to make a downpayment on the same apartment and had repaid the loan in 2003. The Government claims to have learned of these statements via the Assistant District Attorneys to whom the statements were made, documentary evidence and grand jury testimony.

After the Defendant, Mr. Kerik, pled guilty in the Bronx case, the U.S. Attorney's Office for the Southern District of New York, during its investigation of Mr. Kerik, questioned Mr. Tacopina about the above statements. Mr. Tacopina confirmed that he made those statements to the BCDAO and that the information he conveyed was provided by the Defendant for the "express purpose" of conveying it to the Bronx District Attorney's Office. Affirmation, Elliott Jacobson, ¶ 8 (Dec. 12, 2007).[1]

Also during the course of its investigation, the U.S. Attorney's Office met with the New York City Department of Investigation ("NYCDOI"). NYCDOI informed the Government that during a meeting with Mr. Tacopina, the NYCDOI Deputy Commissioner was advised by Mr. Tacopina that the total cost of the apartment renovations was between $30,000 and $50,000, and that the Defendant and no one else

---

[1] It should be noted that the Defendant, in opposing this motion, has not submitted an affidavit challenging any of the statements contained in AUSA Jacobson's Affirmation. Additionally, when given the chance at oral argument to oppose the allegations contained in the Jacobson Affirmation or the Government's moving papers, the Defendant declined to do so.

paid for the renovation costs.  Mr. Tacopina confirmed making these statements and

again stated that he conveyed information provided to him by the Defendant for the

express purpose of conveying it to personnel at NYCDOI.

In the summer of 2005, Mr. Breen joined Mr. Tacopina in his representation of

Mr. Kerik in connection with the BCDAO/NYCDOI investigation.  According to the

Government, Mr. Tacopina informed federal investigators that throughout the course of

the next year the Defendant repeated to Messrs. Tacopina and Breen the substance of the

above statements for the purpose of conveying this information to prosecutors and

investigators.

The Government argues that the statements made to the BCDAO and NYCDOI

are the basis for some of the charges pending against Mr. Kerik, and that Mr. Breen, who

currently serves as Mr. Kerik's counsel, will either be called as a Government witness or

will necessarily be an unsworn witness before the jury in the Defendant's trial.  The

Government notes that the Defendant was notified of the conflict nearly more than seven

months prior to the indictment, and that the Government brought the conflict to the

Court's attention, as it is required to do, immediately after the indictment was returned.

The Government argues that Mr. Breen's representation of Mr. Kerik presents an

unwaivable conflict of interest.

The Defendant argues that the alleged conflict is hypothetical and waivable.  He

argues that the statements in question are (1) privileged; (2) protected under Federal Rule

of Evidence 410 (statements made in the course of plea negotiations); and (3) even if not

covered under Rule 410, the statements should be excluded because admitting them

would deprive the Defendant of his 6th Amendment right to counsel.  The Defendant

further argues that, in any event, any conflict can be cured by remedial measures such as limiting the Government's case and testimony so that Mr. Breen would not be an unsworn witness.

## II.  The Sixth Amendment Right to Counsel

The 6th Amendment right to counsel seeks to ensure that criminal defendants have effective counsel, *United States v. Wheat*, 486 U.S. 153, 159 (1988), and encompassed in that right is the right to conflict-free representation. *See United States v.  Levy*, 25 F.3d 146, 152 (2d Cir. 1994).  The 6th Amendment, however, is not designed to ensure that a defendant will inexorably be represented by the lawyer whom he prefers. *Wheat*, 486 U.S. at 159.  A defendant's right to the lawyer of his choice is not absolute, and the court is not required to accept a defendant's waiver of his lawyer's conflict of interest. *See United States v. Arrington*, 867 F.2d 122, 128 (2d Cir. 1989).

However, a defendant's choice of counsel should not be unnecessarily obstructed, *United States v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir. 1982) (internal quotations and citations omitted).  In determining whether the right of the accused to counsel of his choosing should be honored in a particular case, the court must balance the defendant's constitutional right against the court's need to preserve the highest ethical standards of professional responsibility. *Id.* at 1070.

Where there is a possibility that the defendant's attorney may have a conflict of interest, "[t]he court must investigate the facts and details of the attorney's interest to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *United States v. Levy*, 25 F.3d 146, 153 (2d Cir. 1994).  An

actual conflict is one that is so "severe" that "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation." *Id.* In such a case, the court is "obliged" to disqualify counsel. *Id.* "If the court discovers that the attorney suffers from a lesser or only a potential conflict – such that a rational defendant could knowingly and intelligently desire the conflicted lawyer's representation – the court should follow the procedures set out in *Curcio*." *Id.* If there is no conflict at all, the court has no further obligation. *Id.* There is a "presumption in favor of the accused's chosen counsel [but that] presumption can be overcome by a showing of an actual conflict or potentially serious conflict." *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993).

In the current case, the parties assert several theories to support their respective positions. This Court addresses the most critical of these arguments first, and then directs its attention to any ancillary assertions.

## III.  Unsworn Witness

The Government argues that Mr. Breen, who represented the Defendant when he pleaded guilty before the BCDAO and who was authorized to repeat the Defendant's falsely exculpatory statements to investigators, can not now stand before the court and/or a jury and present defenses at odds with the plea and/or act as an advocate in defending against actions he witnessed that constitute some of the pending charges.

The Defendant claims that Mr. Breen's representation during the Bronx investigation was limited, and that Mr. Tacopina, not Mr. Breen, lead the dialogue that the Defendant asserts constituted plea discussions.[2] Unfortunately for the Defendant, this type of potential disagreement or nuance to the discussions at issue is exactly the kind of

---

[2] For a fuller discussion of this claim, see Sec. IV.B., *infra*.

argument that could necessitate Mr. Breen's testimony at trial. The Defendant notes that he has no intention of attempting to repudiate his guilty plea, but simply reserves the right to challenge the Government's interpretation of his allocution, its relevance to the charges and the weight it should be afforded. This argument misses the point. It is not the truth of Mr. Kerik's plea allocution that is questioned here. The issue is whether in discussions prior to his plea Mr. Kerik authorized his attorneys, including Mr. Breen, to relay statements to the BCDAO and the NYCDOI that were misleading and obstructive.

The New York Code of Professional Responsibility generally forbids lawyers from acting as advocates and witnesses in the same matter. This general prohibition applies where the lawyer knows or it is obvious that he ought to be called as a witness on a significant issue on behalf of a client, *see New York Code of Prof'l Responsibility DR 5-102 (A)*, or where the lawyer may be called as a witness on a significant issue other than on behalf of his client, *see DR 5-102(B)*. In the latter scenario "the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client at which point the lawyer . . . must withdraw from acting as an advocate before the tribunal." *DR 5-102(D)*.

The Defendant contends that the rule precluding an attorney from serving as a witness in a client's case applies only if the lawyer "ought" to be called; in other words, if it is likely that the lawyer's testimony is necessary. *See Paretti v. Cavalier Label Co. Inc.*, 722 F.Supp. 985, 986 (S.D.N.Y. 1989). In determining the necessity of testimony, a court takes into account the significance of the matters, the weight of the testimony, and the availability of other evidence. *Id.* The Defendant argues that Mr. Breen's testimony here would be cumulative because he was present only for meetings similar and

6

subsequent to those meetings where Mr. Tacopina relayed the Defendant's statements to

the BCDAO.  According to the defense, the Government could prove the false

exculpatory statements based on discussions to which Mr. Breen was not a witness, and

the fact that Mr. Tacopina continued to make exculpatory statements outside the context

of the investigation even after Mr. Breen became involved is cumulative and prejudicial

under Rule 403 of the Federal Rules of Evidence.  The Defendant also argues that the

alleged attorney statements are collateral to the relevant charges.

 In this case, Mr. Breen's potential testimony is direct evidence of the charges

contained in the indictment.  It is therefore highly relevant, and even assuming *arguendo*

that it is in some respects cumulative, it does not follow that the Government should be

deprived of this evidence, especially where it is likely that the Defendant will disagree

with and heavily cross-examine Mr. Tacopina regarding the alleged authorization by the

Defendant as well as the substance any discussions.  The Defendant may also choose to

attack Mr. Tacopina's credibility.  Therefore, having Mr. Tacopina's account of the

meetings with the Defendant and separately the BCDAO and the NYCDOI corroborated

by Mr. Breen could be important and necessary testimony for the Government.  Here the

Government alleges that the Defendant obstructed the state investigation through his

lawyers' unwittingly-made obstructive statements.  The direct evidence of those charges

is the attorney's statements to investigators.  The fact that Mr. Breen allegedly

participated in some of the meetings and allegedly did not stop the statements from being

made, contradict or correct them is both relevant and probative.

 Even if Mr. Breen were not to become an actual witness, he would be an unsworn

witness who could subtlety impart to the jury his first-hand knowledge of events without

having to swear an oath or be subject to cross-examination. *See United States v. Locascio*, 6 F.3d 924, 933-34 (2d Cir. 1993).


For defense counsel, becoming an unsworn witness, standing alone, is sufficient for disqualification, *Ciak v. United States*, 59 F.3d 296, 304-05 (2d Cir. 1995), and waiver is "ineffective in curing the impropriety in such [a] situation" because the defendant is not the party prejudiced by such a conflict. *Locascio*, 6 F.3d at 933-34.

In *Locascio* the defendants' lawyer was privy to events surrounding an obstruction charge and participated in conversations taped by the government, pertaining to the defendant's illegal activities.  The District Court of the Eastern District of New York disqualified the attorney because his "mere presence could make him an unsworn witness." *Id.* at 932.   The Circuit Court affirmed the District's Court ruling, reiterating that "[e]ven if [the defendant] waived the conflict, and even if the government did not intend to call [the attorney] as a witness . . . . [the attorney's] representation would still compromise the integrity of the proceeding." *Id.*

This case is similar to *Locascio* in that Mr. Breen was privy to conversations related to the changes pending against the Defendant.  In this case, whether Mr. Breen is actually called as a witness is irrelevant considering the dangers of his becoming an unsworn witness.

> An attorney acts as an unsworn witness when his relationship with his client results in his having first-hand knowledge of the events presented at trial . . .Even if the attorney is not called [ ] he can still be disqualified, since his performance as an advocate can be impaired by his relationship to the events in question.  For example, an attorney may be constrained from making certain

> arguments on behalf of his client because of his own involvement, or may be tempted to minimize his own conduct at the expense of his client. Moreover, his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross-examination.
>
> *Locascio*, 6 F.3d at 933.

For example, in this case, should Mr. Tacopina take the stand, Mr. Breen's questions during cross-examination may be afforded undue credibility because he has first-hand knowledge of the statements and events about which Mr. Tacopina would likely be questioned. Moreover, should Mr. Breen disagree with any of Mr. Tacopina's characterizations of the events surrounding the statements, he will either be forced to sit quietly in detriment to his client or (without taking an oath or being cross-examined) to ask questions to which the jury may assign undue weight. In either case, the risk of prejudice to the Defendant or the Government is too great, and places in jeopardy the integrity of the proceeding. Mr. Breen, therefore, must be disqualified as Defendant's counsel.

## IV.   Other Issues

Although the witness-advocate doctrine is sufficient to disqualify Mr. Breen as Defendant's counsel, it is nonetheless important to address the parties' additional claims.

### A.   Privilege

The Defendant argues that the statements made to Mr. Tacopina are privileged, and that the Government was aware that the Defendant intended to invoke attorney-client and work-product protections.

Where attorney-client communications are disclosed for reasons other than obtaining legal advice to a third party at the direction of the client there is no expectation of privacy or confidentiality, and thus, the client cannot assert the privilege. *See Stirum v. Whalen*, 811 F.Supp. 78, 81 (N.D.N.Y., 1993) ("[W]aiver may be effected through voluntary disclosure by the client, through the client's express consent to disclose, or through implication gleaned from the client's actions."). *See also e.g., In re Von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987) (finding waiver of privilege where a client acquiesced and encouraged the publication of confidential communication); *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) ("[S]ubsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege.").

The Defendant's statements to his attorneys during the course of the BCDAO/NYDOI investigation are not privileged because (1) they were intended to be communicated and were communicated to the BCDAO and NYCDOI, and (2) because, to the extent they related to the apartment renovations, they were allegedly part of an ongoing obstruction of the BCDAO's investigation. According to the Government, Mr. Tacopina stated that he was authorized by the Defendant to make the statements to the investigating authorities, and the Defendant has not disputed that fact. Moreover, the circumstances in which the statements were made are highly suggestive of the fact that the Defendant authorized his counsel to make these statements on his behalf. Finally, as the Government apparently plans to show at trial, the Defendant allegedly made almost identical statements to White House officials vetting him for the Secretary of Homeland

Security position. The Defendant has not disputed that the statements in question here were intended to be conveyed to a third party, and therefore, the statements cannot be considered confidential and privileged.

Even if the statements were privileged, which this Court finds they were not, and the privilege had not been waived, the statements would still be admissible under the crime-fraud exception, even where, as here, the attorney was not a knowing participant in the crime or fraud in question. *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984).

Communications made to an attorney are excluded from the privilege where the party invoking the crime-fraud exception demonstrates that there is probable cause to believe that the particular communication or work-product was intended to facilitate or conceal ongoing or contemplated criminal or fraudulent activity. *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995). Such as exception exists because "[a]lthough there is a societal interest in enabling clients to get sound legal advice, there is no such interest when the communications or advice are intended to further the commission of a crime or fraud." *Id.*

The Government in this case has demonstrated, largely by virtue of the indictment, that probable cause exists to show that the statements at issue were made to the Defendant's attorneys for the purpose of furthering and/or concealing criminal or fraudulent activity. *See United States v. Cannone*, 528 F.2d 296, 302 n.6 (2d Cir. 1975) ("While by no means conclusive, the issuance of an indictment is certainly probative of the likely validity of its charges. . . ."). The Defendant told his attorneys that the renovations to the Riverdale apartment were valued at $50,000 and that he alone paid for

11

the renovations.  The indictment alleges that the renovations were valued at $255,000 and

were paid for by John Doe #1, John Doe #2 and XYZ. *See* Indictment, ¶ 12 (Nov. 8,

2007).  Additionally, the Defendant pleaded guilty to accepting $165,000 worth of

renovations from XYZ. Transcript of Plea Allocution, pgs. 7-10 (June 30, 2006).  Given

the indictment, the Defendant's plea and the circumstances in which the statements were

made, there is probable cause to believe that the Defendant's statements to his attorneys

were made in furtherance of and/or for the purpose of concealing criminal or fraudulent

activity.  Therefore, these statements are admissible pursuant to the crime-fraud

exception to the attorney-client privilege.


## B. Plea Negotiations

The Defendant argues that the alleged attorney statements are not admissible

because they were made in connection with plea discussions and negotiations.  Fed. R.

Evid. 410; *United States v. Serva*, 799 F.2d 842, 849 (2d Cir. 1986) (preliminary

discussion must be considered as part of the overall plea bargaining process).  The

defense also notes that Rule 410 applies in federal proceedings to statements made in

connection with prior state pleas.  *See e.g. United States. v. Chapman*, 954 F.2d 1352,

1360 (7th Cir. 1992).

The purpose of Rule 410 is to "promote negotiations by permitting defendants to

talk to prosecutors without sacrificing their ability to defend themselves if no disposition

is reached," *United States  v. Barrow*, 400 F.3d 109, 116 (2d Cir. 2005), and only

excludes statements made in plea discussions that do not result in a plea of guilty.  As

such, the rule does not apply here because Mr. Kerik eventually pleaded guilty.  Third,

"[b]ecause Rule 410 is an exception to the general principle that all relevant evidence is admissible at trial its limitations are not to be read broadly. . . ." *Barrow*, 400 F.3d at 116. The Rule should not be read to encourage or reward false proffers.

In this case, the text of Rule 410 clearly shows that the defense's argument is without merit. First, even assuming *arguendo* that these statements constituted preliminary plea discussions, the Rule is not applicable because the Government is not seeking to admit evidence of a guilty plea later withdrawn, a plea of nolo contendere, or any statement regarding these types of pleas.[3] Rule 410 is meant to protect a defendant who participates in an unsuccessful plea discussion from later having his admissions used against him. In this case, the Defendant pleaded guilty, and therefore, Rule 410 does not apply. *See e.g., United States v. Persico*, 621 F.Supp. 842, 872 ("The Court of Appeals for the Second Circuit has ruled that a prior plea of guilty to one crime was admissible against the defendant who pleaded to prove an element of a newly charged crime.") (citing *United States v. Andreadis*, 366 F.2d 423, 433 (2d Cir.1966), *cert. denied*, 385

---

[3] Rule 410 of the Federal Rules of Evidence reads:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
> (1) a plea of guilty which was later withdrawn;
> (2) a plea of nolo contendere;
> (3) any statement made in the course of any proceedings under Rule 11 of the Federal Rules of Criminal Procedure or comparable state procedure regarding either of the foregoing pleas; or
> (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.
> However, such a statement is admissible (i) in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it, or (ii) in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel.

Rule 11(f) of the Federal Rules of Criminal Procedure states "[t]he admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410."

U.S. 1001 (1967); *Myers v. United States*, 49 F.2d 230, 231 (4th Cir.), *cert. denied*, 283 U.S. 866 (1931)).  Moreover, this Court is unconvinced that these discussions constitute plea discussions in the first instance.  The facts as alleged by the Government demonstrate that the Defendant's statements were not made to honestly facilitate plea discussions, but rather, were made in order to mislead the BCDAO and NYCDOI regarding the Defendant's guilt and to obstruct the investigations of his actions. The discussions between Mr. Tacopina and the BCDAO can more accurately be described as attempts by the Defendant to convince the authorities that he was innocent.  If this Court were to adopt the Defendant's interpretation of Rule 410, a defendant through his lawyer could lie and mislead a government investigator or prosecutorial office with impunity as long as the meeting where the statements were made could be styled as a plea discussion. This Court rejects that proposition.  The statements at issue here have little to do with the ultimate disposition in the state proceedings.  They were made denying the Defendant's guilt, and therefore cannot be said to fall under the protections of Rule 410.

## V.  Defendant's Attempts to Cure the Conflict: Waiver and Other Remedial Measures

The Defendant argues that his attorney's conflict can be waived or otherwise remedied.

In assessing whether to accept a waiver, the court should consider, among other things, "whether disqualifying the defendant's chosen counsel would create real prejudice to the defendant based on the length of the representation and/or counsel's familiarity with the case, [and] whether there is a possibility that the attorney could be called as a witness at the defendant's trial or implicated in the defendant's alleged crimes. . . ."

*United States. v. Stein*, 410 F.Supp. 2d 316, 328 (S.D.N.Y. 2006) (internal quotations omitted).  The court should also consider the defendant's agreement to remedial measures, such as the limitation of testimony, *see e.g.*, *United States. v. Jones*, 900 F.2d 512, 520 (2d Cir. 1990), or whether an independent counsel can conduct cross-examination of witnesses like Mr. Tacopina.

With respect to limitations of testimony, the Defendant argues that Mr. Tacopina could be questioned without the jury knowing that Mr. Breen was present at the relevant meetings.  Then, according to the Defendant, the jury would not afford undue weight to Mr. Breen's questions or statements made during the course of the trial.

The Defendant's attempts to cure the conflict are simplistic.  Whether Mr. Breen agrees with or disputes the testimony of Government witnesses concerning the statements made to the BCDAO and the NYCDOI, he is an *actual* witness to the alleged crime.  There are a host of scenarios in which, even if Mr. Breen's name were not mentioned during testimony, the conflict would still not be addressed.  For example, Mr. Breen may be constrained from making certain arguments, or may be tempted to minimize his conduct at the expense of his client, and thus could not be said to advocate effectively for the Defendant.

A prediction concerning the effectiveness of this remedy, however, is unnecessary because Mr. Breen's conflict cannot be waived by his client.  As the Second Circuit stated in *Locascio*, a waiver is insufficient in curing a conflict posed when a defendant's advocate is also a witness because the defendant is not the party prejudiced by the defense attorney's continued involvement as an advocate, the Government is. *See Locascio*, 6 F.3d at 934 ("The detriment is to the government, since the defendant gains

an unfair advantage, and to the court, since the factfinding process is impaired.") The conflict in this case is so severe that no remedial measure will cure it.

Mr. Breen is hereby disqualified as counsel to the Defendant, Mr. Kerik.  Mr. Kerik has until 30 days from the date of this order to obtain conflict free counsel.

IT IS SO ORDERED.

Dated: White Plains, New York
      January 23, 2008

                              Stephen C. Robinson, U.S.D.J.

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *v.* | S1 07 Cr. 1027 (SCR) |
| BERNARD B. KERIK, | OPINION AND ORDER |
| Defendant. | |

**STEPHEN C. ROBINSON, United States District Judge:**

The defendant, Bernard Kerik, is charged with various federal crimes in a fifteen-count,

omnibus Superseding Indictment. On September 22, 2008, Kerik filed a pretrial motion seeking

to dismiss certain charges, to sever counts in the indictment, and to obtain additional discovery

from the Government.[1] After the parties filed nearly 250 pages of briefing, the motion was fully

submitted on January 23, 2009 and oral argument was heard on February 3, 2009. For the

reasons set forth in this Opinion and Order, Kerik's various motions are granted in part and

denied in part.

## I.    Background

Because Kerik moves to dismiss several charges by challenging the legal sufficiency of

the Superseding Indictment, the Court begins by summarizing the allegations against the

defendant.[2] For the purposes of resolving Kerik's pending motion to dismiss, the pertinent

allegations in the Superseding Indictment are assumed to be true. *Boyce Motor Lines v. United*

---

[1] The original Indictment was returned on November 8, 2007. During briefing on the present motion, a grand jury returned a Superseding Indictment on December 2, 2008. The Superseding Indictment rendered moot Kerik's multiplicity objection to the original Indictment.

[2] This account supplements the Court's summary of allegations against Kerik in a related opinion, *United States v. Kerik*, 531 F. Supp. 2d 610 (S.D.N.Y. 2008).

*States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d
Cir. 1999).

During the time period covered by the Superseding Indictment, Kerik held and sought
various positions of public trust. From January 5, 1998 to August 20, 2000, Kerik served as the
Commissioner of the New York City Department of Corrections ("DOC"), thereafter serving as
the New York City Police Commissioner until January 1, 2002. Sup. Indict. ¶¶ 1-2. In 2003, he
accepted the post of Senior Policy Advisor to the Interior Minister of the Coalition Provisional
Authority of Iraq. In December 2004, the President of the United States nominated Kerik to
serve as Secretary of the Department of Homeland Security, a position for which Kerik later
withdrew from consideration. Sup. Indict. ¶ 50. Based on facts uncovered during that
nomination process, the Bronx County District Attorney and the New York Department of
Investigation opened an investigation into Kerik's activities. This investigation concluded in
June 2006 upon Kerik's guilty plea to two unclassified misdemeanors in state court.

The federal government subsequently brought the following charges. In Count One,
Kerik is charged with conspiracy to violate the mail and wire fraud statutes from 1998 to 2006,
in violation of 18 U.S.C. § 1349. The Superseding Indictment alleges that Kerik conspired with
at least two other unnamed individuals (principals of an anonymous XYZ Company) to defraud
and deprive the City of New York and its citizens of their intangible right to Kerik's honest
services as a government official. Sup. Indict. ¶ 5. Specifically, the conspirators agreed that
Kerik would use his public office as Commissioner of Corrections, and subsequently as Police
Commissioner, to "vouch" for XYZ in order to influence regulators and other public officials
who were considering whether XYZ should be licensed to do business in New York City. Sup.
Indict. ¶¶ 14-16. At that time, XYZ was seeking municipal-regulated business, including a

permit from the New York City Department of Sanitation to operate a material fill transfer station on Staten Island. Sup. Indict. ¶ 6. The Superseding Indictment alleges that a part and object of the conspiracy was that XYZ would "obtain licenses, permits, clearances, and approvals to do business with one or more New York City agencies or within an industry regulated by the City," including the material fill transfer station permit. Sup. Indict. ¶ 7. In return, Kerik received approximately $255,000 in renovations to his apartment in Riverdale, New York, from John Doe #1, John Doe #2, and XYZ. Sup. Indict. ¶¶ 12-13, 29(a). Finally, the Government alleges that "it was a necessary part of the agreement to conceal the illegal payments [to Kerik] from New York City officials and regulators" while XYZ was seeking authorization from the City to obtain licenses and permits. Sup. Indict. ¶ 20.

Counts Two and Three charge Kerik with the substantive counts of mail and wire fraud, respectively, for the theft of Kerik's honest services as described in Count One, in violation of 18 U.S.C. §§ 2, 1341, 1343, and 1346. Sup. Indict. ¶¶ 21-24.

Count Four charges Kerik with corruptly obstructing and impeding the due administration of the federal tax laws. Sup. Indict. ¶ 27; 26 U.S.C. § 7212(a). First, Kerik failed to report as taxable income for 1999 and 2000 the renovation value to his Riverdale apartment worth $255,000. Sup. Indict. ¶ 29(a). Second, Kerik failed to report the apartment rental value of payments made on Kerik's behalf by a Manhattan realtor valued at $236,269.36 from 2001 through 2003. Sup. Indict. ¶ 29(b). Third, Kerik failed to report his consulting income of $20,000 from a computer software company in 2002. Sup. Indict. ¶ 29(c). Fourth, Kerik failed to report publishing royalties he received from 2002 through 2004 totaling $75,953. Sup. Indict. ¶ 29(d). Fifth, Kerik failed to report as taxable income in 2005 the use of a new luxury sedan provided by a car company as compensation for Kerik's services. Sup. Indict. ¶ 29(e). Sixth, in

early 2003 Kerik falsely advised his accountant that he had made $80,000 in charitable contributions. Based on this information, Kerik signed a false U.S. Individual Income Tax Return that listed phony tax deductions of $80,000. Sup. Indict. ¶ 30(a). Seventh, Kerik claimed a false business expense deduction in 2003 for the use of a home office that he claimed to have maintained in the state of New Jersey. Sup. Indict. ¶ 30(b). Eighth, Kerik failed to report to the Internal Revenue Service in 2002 and 2003 that he employed a regular domestic employee as a nanny. Kerik also failed to remit any payroll taxes due and owing for his nanny, including Social Security and Medicare taxes. Sup. Indict. ¶ 31. Finally, the Government charges that Kerik structured his financial transactions in such a way to avoid alerting the IRS of his tax evasion. Sup. Indict. ¶ 28.

Counts Five through Seven charge Kerik with aiding and assisting in the preparation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2), and Counts Eight and Nine charge Kerik with subscribing to false income tax returns, in violation of 26 U.S.C. § 7206(1). These charges are premised on the same underlying tax allegations set forth above. Sup. Indict. ¶¶ 33, 35 (accompanying charts).

In Count Ten, Kerik is charged with misrepresenting a personal loan in September 1999 on an application for a mortgage from National Community Bank, a financial institution insured by the Federal Deposit Insurance Corporation. Specifically, Kerik accepted a personal loan of $28,000 from "John Doe #6," a Manhattan realtor who conducted business that required various approvals from New York City. Kerik falsely reported to National Community Bank that the funds were a wedding gift and failed to classify the loan as a liability on his mortgage application. Sup. Indict. ¶¶ 36-40.

Finally, Counts Eleven through Fifteen charge Kerik with making false statements to the federal government, in violation of 18 U.S.C. § 1001.  As will be explained in greater detail in the Court's analysis below, Kerik is alleged to have misrepresented the following facts:  (1) that Kerik did not employ any household employees on a regular basis; (2) that Kerik possessed no questionable business relationships or information that might cause embarrassment to himself or the President; (3) that Kerik did not have any liabilities in excess of $10,000 in November 2003; and (4) that Kerik, while serving as a public official, did not have any financial dealings with individuals seeking to do business with New York City.  Finally, the Government charges that Kerik gave a false and misleading account of the true nature of his relationship with John Doe #3—an employee of XYZ—and the renovations to Kerik's Riverdale apartment.

**II.    Analysis**

In the gravamina of this motion, Kerik challenges the sufficiency of particular charges in the Superseding Indictment.  A defendant seeking to dismiss counts under Rule 12 must satisfy a "high standard."  *United States v. Lazore*, 90 F. Supp. 2d 202, 203 (N.D.N.Y. 2000).  As the Supreme Court of the United States has explained:

> [A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.  It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.  Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.

*Hamling v. United States*, 418 U.S. 87, 117-18 (1974) (internal quotation marks and citations

omitted); *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). With this direction, each of

Kerik's arguments is considered in turn below.

### a.  Validity of the Honest Services Fraud Charge

In short, sections 1341 and 1343 of Title 18 criminalize the use of the federal mails and

wires, respectively, for the purpose of executing "any scheme or artifice to defraud." As 18

U.S.C. § 1346 helpfully clarifies, "For the purposes of this chapter, the term 'scheme or artifice

to defraud' includes a scheme or artifice to deprive another of the intangible right of honest

services." Equipped only with these 28 cryptic words, it is the duty of the courts to cast form out

of the nebulous crime of honest services fraud.[3]

Kerik argues that the conduct charged in the Superseding Indictment does not constitute a

federal crime, and he moves to dismiss Counts One, Two, and Three for failure to state a claim

for honest services fraud. In framing the issue for the Court, Kerik argues for "a sharp

distinction between the use, or even misuse, of the *influence* of office in activities falling *outside*

a defendant's official duties—which cannot support a prosecution for federal honest services

fraud—and corruption in connection with the performance of a defendant's official duties—

which can." Mem., pp. 21, 25 (collecting cases).[4] In sum, Kerik argues that no cases affirm a

conviction for "influence peddling"[5] where the public official was acting outside the context of

---

[3]  This Court is not the first to struggle with the scope of honest services fraud, and it will surely not be the last. As
one circuit court has noted, "The central problem is that the concept of 'honest services' is vague and undefined
by the statute. So, as one moves beyond core misconduct covered by the statute (*e.g.*, taking a bribe for a
legislative vote), difficult questions arise in giving coherent content to the phrase through judicial glosses."
*United States v. Urciuoli*, 513 F.3d 290, 294 (1st Cir. 2008).

[4]  Memorandum of Law in Support of Bernard B. Kerik's Pretrial Motions ("Mem."), dated Sept. 22, 2008.

[5]  This term, used in the Superseding Indictment, aptly characterizes the honest services fraud allegation against
Kerik in this case. Sup. Indict. ¶ 3(j).

his official duties.[6] Mem., p. 31 (distinguishing cases). Because Kerik is alleged to have used his status as Commissioner of the DOC and Police Commissioner to "vouch" for XYZ in connection with business integrity investigations of that company being conducted by three independent agencies—not by any agency under Kerik's control—he urges the Court to dismiss the charges for honest services fraud.

Kerik offers *United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008), as his leading case. In *Urciuoli*, the Court of Appeals for the First Circuit reversed the convictions of two hospital executives accused of conspiracy to deprive Rhode Island citizens of the honest services of a state legislator. The legislator was charged with failing to disclose his financial interest in the hospital on two specific occasions: (1) when lobbying mayors to "comply with Rhode Island law governing patient entitlement to be taken by ambulance to the hospital of the patient's choice," and (2) when negotiating a settlement between an insurance company and the hospital. 513 F.3d at 294. In this second instance, the legislator was alleged to have threatened to use his official authority to punish the insurance company unless it reached a settlement favorable to the hospital. *Id.* at 296-97.

The district court instructed the jury that an elected official owes a duty to provide honest services when he acts "under the cloak of office"—a phrase intended to capture a sphere of behavior broader than the official's formal duties. *Id.* at 295. The First Circuit held that this instruction was erroneous because it could include private conduct that does not implicate "any purported oversight authority or threatened . . . use [of] official powers in support of his advocacy." *Id.* at 296. Pertinently, the court determined that the legislator's "title and (possibly improper) use of his senate letterhead assured him access and attention; but his position

---

[6] In the Superseding Indictment, the Government removed its former allegation that it was one of Kerik's official duties to confer with other government officials. Therefore, the parties agree that Kerik is not alleged to have violated his *official* duties in vouching for XYZ.

guaranteed that in any event and its invisible force would have existed even if he emphasized that he was present solely as a paid advocate." *Id.* The court ultimately reversed the defendants' conviction for lobbying the mayors, but permitted an honest services fraud prosecution for the legislator's threatened use of his power in the insurance settlement conference.

While *Urciuoli* may be fairly read to support Kerik's position,[7] other courts—including the Court of Appeals for the Second Circuit—have held that a defendant may be charged with honest services fraud for using his or her influence with governmental decision-makers for personal gain, even if the alleged scheme does not implicate one of the defendant's official duties. On this point, *United States v. Middlemiss*, 217 F.3d 112 (2d Cir. 2000), and *United States v. Bush*, 522 F.2d 641 (7th Cir. 1975), are instructive. In *Middlemiss*, a public affairs officer at the Port Authority of New York and New Jersey agreed to help a businessman obtain a lease from the Port Authority to operate a diner at JFK International Airport. 217 F.3d at 115. Middlemiss did so in exchange for a 12.5% interest in the diner. *Id.* Middlemiss recommended to other officials that the lease be approved, while failing to disclose his financial interest in the diner. Middlemiss argued on appeal that his conviction was improper under 18 U.S.C. § 1346 because "he did not render dishonest or corrupt services because his official job duties had nothing to do with airport leasing." *Id.* at 119-20. Yet the Second Circuit held that as long as a public employee has engaged in a scheme to deprive the employer of his honest services, "there is no requirement that the scheme also implicate the [employee's] official duties." *Id.* at 120.

---

[7] The Court notes that *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), also supports Kerik's position. 583 F.2d at 1026 ("We also find no evidence that Rabbitt's conduct deprived the citizens of their right to honesty and fairness in the conduct of his official duties. Rabbitt did not, in his official capacity, control the awarding of contracts to architects."). *Rabbitt* has been questioned by other circuits, *see Urciuoli*, 513 F.3d at 296 (setting aside the issue "whether *Rabbitt* is correct"); *United States v. Holzer*, 816 F.2d 304, 309 (7th Cir. 1987) ("We very much doubt the soundness of this reasoning. The fact that the defendant did not control the award of contracts should not be decisive if his position as a state legislator gives his recommendations a weight independent of their intrinsic merit."), and this Court is not persuaded by its reasoning.

Similarly, in *Bush*, the press secretary to the Mayor of Chicago failed to disclose his financial interest in an advertising company while he was advocating on the company's behalf for a contract at O'Hare International Airport.[8] The court reasoned that although Bush was not responsible for awarding the O'Hare advertising contract, he used his "official position within the mayor's inner circle to exert the substantial influence which he had on those who were responsible for negotiating the contract." 522 F.2d at 647. Importantly, the court concluded, "Bush was not making his recommendation merely as a disinterested public servant. His ownership of [the advertising company] was material to the city officials' evaluation of Bush's opinion of the company which he was recommending." *Id.* Bush's failure to render honest services, combined with his material misrepresentations and active concealment, violated federal law. *Id.* at 648.

Considering the applicable case law, the Court concludes that "[m]isuse of office (more broadly, misuse of position) for private gain is the line that separates run of the mill violations of state-law fiduciary duty . . . from federal crime." *United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998).[9] It is apparent, at this stage in the case, that Kerik "used" his office—literally and figuratively—to vouch for John Doe #1, John Doe #2, John Doe #3, and XYZ.[10] Kerik did

---

[8] *United States v. Bush* was decided before the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987). In *McNally*, the Supreme Court held that a scheme under the mail and wire fraud statutes must implicate a property right; consequently, honest services fraud (an intangible right) was not actionable. Congress responded the following year by enacting 18 U.S.C. § 1346, which abrogated *McNally* and reinstated the honest services fraud crime. Thereafter, courts have relied on pre-*McNally* precedent to interpret the scope of 18 U.S.C. § 1346. *See, e.g., United States v. Rybicki*, 354 F.3d 124, 138-39 (2d Cir. 2003) (en banc).

[9] Kerik's reliance on *Bloom* is misplaced. The charges against Bloom arose from his conduct as a lawyer in the private-sector. The Seventh Circuit held that Bloom could not be charged with honest services fraud for his private conduct—giving a client legal advice that could harm the city's financial interests—simply because Bloom also held a concurrent, part-time position as an Alderman for Chicago's Fifth Ward. As the Seventh Circuit emphasized, the indictment "d[id] not charge that [the defendant] *used* his office in any way, let alone that he *misused* it." 149 F.3d at 655.

[10] Sup. Indict. ¶ 18 ("In or about August or September of 1999, Kerik facilitated a meeting between John Doe #3 and [New York City Trade Waste Commission] Investigators in his [DOC] office and allowed his official offices to be used by them to discuss the ongoing investigation of XYZ."); Tr. at 88 ("Mr. Kerik used his inside contacts to

not vouch for his co-conspirators simply as a private citizen; taking the allegations in the light

most favorable to the Government, the Superseding Indictment fairly charges that *but for* Kerik's

official status, he would not have been able to play his designated role in the conspiracy.  Sup.

Indict. ¶ 10 ("In or about late 1998, XYZ enlisted the influence and assistance of Kerik in its

efforts to convince regulators that the company had rid itself of organized crime ties and

otherwise possessed the requisite integrity to perform publicly funded or regulated contracts.").

It was precisely his official access and power that afforded Kerik the ability to influence other

officials.

While the Court desires to cabin the breadth of section 1346 due to potential abuse of

honest services fraud prosecutions, Kerik's position is inconsistent with binding case law in this

circuit—namely, *Middlemiss*—and would create an imprudent precedent for public

officeholders.  Moreover, it is unlikely that Congress intended to permit an official to receive

surreptitious payments and, in exchange, use his official status—with all its access and

influence—to steer the direction of government business so long as that official did not abuse

one of his official, enumerated duties.  Although teetering on the boundaries of 18 U.S.C.

§ 1346, the Court concludes that the Superseding Indictment charges a colorable allegation of

honest services fraud.

Finally, Kerik argues—presumably to preserve the issue for appeal—that 18 U.S.C.

§ 1346 is unconstitutionally vague.  Mem., p. 33.  Of course, in *United States v. Rybicki*, 354

F.3d 124 (2d Cir. 2003), an en banc panel of this Circuit squarely rejected the argument that

section 1346 is unconstitutionally vague on its face.  In the alternative, Kerik urges the Court to

---

facilitate a meeting in his physical office as [C]orrections [C]ommissioner with representatives of the New York
City Trade Waste Commission and John Doe #3.  Mr. Kerik attended a meeting with an official from the New
York City Department of Investigation and the Trade Waste Commission.  He then called the assistant
commissioner of the Department of Investigation to attempt to vouch for XYZ.").

consider the rule of lenity, due process, and fair warning when construing the honest services

fraud statute, *i.e.*, that Kerik did not have fair notice that a public official could be prosecuted

under the mail and wire fraud statutes for conduct unrelated to his performance of his official

duties. While at least one member of the Supreme Court may be sympathetic to this argument,[11]

*Rybicki* and *Middlemiss* foreclose the issue for this Court.

### b. Statute of Limitations

Alternatively, Kerik moves to dismiss Counts One, Two, and Three as barred by the

applicable statute of limitations. Because the Government alleges that separate acts place each

Count within the limitations period, the Court considers each charge separately.

### i. Count One—Conspiracy

Federal conspiracy claims are subject to a five-year statute of limitations that runs after

the last overt act in furtherance of the conspiracy was committed. Due to three separate tolling

agreements between Kerik and the Government, the applicable, effective date of the indictment

for limitations purposes is April 14, 2007.[12] Thus, the Government must proffer evidence of an

ongoing conspiracy as of April 14, 2002 to satisfy the limitations bar.

To determine whether any acts in furtherance of a conspiracy were committed in the

limitations period, the Court must, as a threshold matter, construe the scope of the alleged

conspiracy. *Grunewald v. United States*, 353 U.S. 391, 397 (1957) ("[T]he crucial question in

determining whether the statute of limitations has run is the scope of the conspiratorial

---

[11] Dissenting from a denial of certiorari, Justice Scalia recently commented on the "current chaos" surrounding the honest services fraud statute, 18 U.S.C. § 1346. *Sorich v. United States*, 129 S.Ct. 1308, 1311 (2009) (Scalia, J., dissenting). Justice Scalia criticized lower courts for failing to identify some coherent limiting principle to define "the intangible right to honest services." 129 S.Ct. at 1309-10. Failure to specify the "principle . . . that separates the criminal breaches, conflicts and misstatements from the obnoxious but lawful ones," Justice Scalia observed, "invites abuse by headline-grabbing prosecutors in pursuit of local officials, state legislators, and corporate CEOs who engage in any manner of unappealing or ethically questionable conduct." *Id.* at 1310.

[12] *See* Gov't Exhs. B, C, and D to Government's Memorandum of Law in Opposition to Defendant's Pre-Trial Omnibus Motions ("Opp."), dated Dec. 5, 2008.

agreement, for it is that which determines both the duration of the conspiracy, and whether the

act relied on as an overt act may properly be regarded as in furtherance of the conspiracy."); *accord United States v. Salmonese*, 352 F.3d 608, 614 (2d Cir. 2003). Kerik argues that the

conspiracy is limited to the misuse of his office as Commissioner of the Department of

Corrections and the NYPD. Because Kerik resigned his post as Police Commissioner on January

1, 2002, he argues that there can be no overt acts within the five-year limitations period.

Kerik's formulation construes the scope of the conspiracy too narrowly and ignores other

allegations in the Superseding Indictment. The Superseding Indictment alleges at least three

distinct objects or means of the conspiracy. First, the conspirators agreed to execute a "scheme

and artifice to defraud, and to deprive the City of New York and its citizens of their intangible

right to honest services of Kerik." Sup. Indict. ¶ 5. Second, it was "a part and object of the

conspiracy that XYZ, John Doe #1, John Doe #2, and others known and unknown would and did

give money and other things of value to Kerik, and that Kerik, while concealing material

information . . . agreed to assist and endeavored to assist XYZ though the use of his public

office, by, among other things, contacting on XYZ's behalf regulators and other public officials

who were considering whether XYZ should be licensed to do business in New York City and

should be awarded municipal-related business . . . ." Sup. Indict. ¶ 6. Third, "[i]t was further a

part and object of the conspiracy that XYZ would obtain licenses, permits, clearances, and

approvals to do business with one or more New York City agencies or within an industry

regulated by the City . . . ." Sup. Indict. ¶ 7. In summary, the object of the conspiracy was that

Kerik would use his public office to vouch for John Doe #1, John Doe #2, and XYZ in order to

help them get the requisite licenses and permits from the City of New York. In return, Kerik

received over $250,000 in renovations to his Riverdale apartment.

Therefore, a key object of the conspiracy was for XYZ to gain the licenses and permits to do business with the City of New York. Indeed, it seems apparent from the allegations in the Superseding Indictment that this was the full economic motivation for Kerik's co-conspirators. It follows, then, that the conspiracy continued in operation—absent some act of affirmative withdrawal—until that object was either achieved or obviated. *Salmonese*, 352 F.3d at 615 (recounting the "well-established principles that (1) a conspiracy continues until its aim has been achieved, it has been abandoned, or otherwise terminated, and (2) absent withdrawal, a conspirator's participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators") (internal quotation marks and citations omitted).

In a bill of particulars provided to the defendant on November 30, 2007, the Government disclosed its intent to introduce a letter to the Department of Sanitation from an attorney of XYZ, dated October 28, 2002. *See* Gov't Exh. E, pp. 6-7 (bill of particulars). The communication sets forth background information on XYZ on an application for a fill material operation permit. *See* Gov't Exh. F. On the application, XYZ checked "no" in response to the question whether it had "given, or offered to give, money or any other benefit to a public servant with the intent to influence that public servant with respect to any of his or her official acts, duties or decisions" within the last 10 years. *Id.*, p. 9 (question 23(b)). This mailing was unquestionably sent during the limitations period and was plausibly issued in furtherance of the conspiracy to corruptly obtain New York City permits. *United States v. Rucker*, 586 F.2d 899, 906 (2d Cir. 1978) ("Every act in furtherance of the conspiracy is regarded in law as a renewal or continuance of the unlawful agreement, and the conspiracy continues so long as overt acts in furtherance of its purposes are done."). It is axiomatic that the acts of a conspirator are attributable to his co-

conspirators and may be considered for purposes of determining the statute of limitations.

*Salmonese*, 352 F.3d at 617.

Because the Court finds that the Government can offer at least one overt act in furtherance of the conspiracy's scope within the applicable statute of limitations, the Court need not consider the parties' remaining arguments.[13]  Kerik's motion to dismiss Count One as untimely is denied.

### ii.  Count Two—Mail Fraud

The same five-year limitations period applies to the substantive counts of mail and wire fraud.  18 U.S.C. § 3282.  Kerik urges the Court to dismiss Counts Two and Three as untimely because Kerik cannot have continued a scheme to deprive the citizens of New York of his honest services after he left office.  Subject to a minor caveat explained *infra*, the Court agrees.  For the reasons set forth below, Count Three is dismissed as untimely and Count Two may remain as charged.[14]

---

[13] Specifically, the Court declines to decide the Government's alternative argument, based on *United States v. Mennuti*, 679 F.2d 1032 (2d Cir. 1982), that the conspiracy continues until the conspirators "receive their anticipated economic benefits." 679 F.2d at 1035.  Also, given that the Court does not regard the effect of any so-called "concealment conspiracy" in deciding the timeliness of Count One, it is unnecessary to resolve Kerik's argument relying on *Grunewald v. United States*, 353 U.S. 391 (1957).  Finally, the Court, at this time, need not resolve the Government's argument that 18 U.S.C. §1349 does not require an overt act and that the conspiracy is therefore presumed to continue in perpetuity.  *See* Opp., p. 19; *Salmonese*, 352 F.3d at 620 ("In such cases [where no overt act is required], once the government proves the conspiracy's existence, the scheme's continued operation into the limitations period is presumed without the jury having to find proved the timely commission of any overt act, alleged or unalleged.") (citations omitted).  As an alternative means to defeat a statute of limitations defense, the Government expects to prove at trial that the Business Integrity Commission issued its completed recommendation to the New York City Department of Sanitation (DOS), urging the DOS to deny XYZ's application for a permit to operate the material fill station because of XYZ's ties to organized crime.  Opp., p. 18.  This recommendation, purportedly issued on March 7, 2005, sits comfortably within the limitations period, and the Government argues that the conspiracy is presumed to continue at least until this juncture.  As resolution of this issue is unnecessary for this Court's present decision, it may be raised again at a later occasion.

[14] Consideration of this matter is not premature, notwithstanding the Government's argument to the contrary.  *See* Opp., pp. 26-28.  In fact, a statute of limitations defense must be raised before a trial, else it is waived.  *United States v. Walsh*, 700 F.2d 846, 856 (2d Cir. 1983); 24 *Moore's Federal Practice*, § 612.05[3] (Mathew Bender 3d ed. 2008).  *United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998), does not hold otherwise.  In *Alfonso* the Second Circuit held that the "determination of whether the jurisdictional element has been satisfied" is premature on a Rule 12 motion when it "is part and parcel of the inquiry into the 'general issue' of whether the statute has been violated." 143 F.3d at 777.  The Government argues that details of the particular wire or mailing are

The mail fraud statute criminalizes the use of the federal mails to perpetrate "any scheme or artifice to defraud," including a "scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. §§ 1341, 1346. By definition, the criminal "scheme" for which Kerik is charged must relate directly to the deprivation of honest services. The Superseding Indictment refers to the scheme as "influence peddling," and, as the Superseding Indictment explicitly alleges, the honest services *scheme* is only a subset of the "scope" of the honest services *conspiracy*. In other words, the honest services fraud was only one part of the broader conspiracy to unlawfully obtain licenses and permits for XYZ.

Given that the honest services scheme necessarily terminated when Kerik left office—after all, one stripped of his influence has nothing left to peddle—the question becomes whether any subsequent acts can be classified "in furtherance" of that scheme. *See Schmuck v. United States,* 489 U.S. 705, 715 (1989) ("The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time . . . ."). Under limited circumstances, a subsequent act designed to "lull" a victim into believing that no scheme occurred is sufficient to constitute a substantive act in furtherance of the scheme. *See United States v. Victor Teicher & Co.,* 726 F. Supp. 1424, 1435 (S.D.N.Y. 1989) ("[C]ommunications subsequent to the end of a scheme to defraud can support a wire fraud charge where they 'were

---

"jurisdictional elements" that also constitute "substantive elements" of the offense charged. *See Rybicki,* 287 F.3d at 260 (use of the mails and wires is a jurisdictional element). In this case, however, the Government has already proffered the exact wire and mailing that it contends will satisfy the five-year statute of limitations in 18 U.S.C. § 3282, a proffer explicitly absent in *Alfonso.* 143 F.3d at 777 n.7 ("[T]he formal consent of both parties would not be required for the district court to undertake a pretrial determination of the sufficiency of the jurisdictional evidence where the government has made a sufficient proffer to permit such a ruling . . . ."). Moreover, the simple determination of whether the particular wire or mailing falls within the applicable limitations period does not, in any fashion, resolve the "general issue" of whether the mail and wire fraud statutes have been violated. *See* FED. R. CRIM. P. 12(b) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."). "The general issue in a criminal trial is, of course, whether the defendant is guilty of the offense charged." *United States v. Doe,* 63 F.3d 121, 125 (2d Cir. 1995); *Alfonso,* 143 F.3d at 777 (same). Pre-trial resolution of Kerik's limitations argument simply protects the defendant from having to defend against stale charges.

designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'") (quoting *United States v. Maze*, 414 U.S. 395, 403 (1974)); *see also United States v. Lane*, 474 U.S. 438, 451-53 (1986).

The Government argues that Count Two is timely because the letter to the Department of Sanitation from an attorney of XYZ, dated October 28, 2002, was designed to lull the DOS from discovering the honest services fraud scheme. As described above, XYZ checked "no" in response to the question whether it had "given, or offered to give, money or any other benefit to a public servant with the intent to influence that public servant with respect to any of his or her official acts, duties or decisions" within the last 10 years. Opp., Exh. F, p. 9 (question 23(b)). It does not strain credulity—and a reasonable juror could find—that the letter constitutes a part of the scheme to deprive New York citizens of Kerik's honest services and was a conscious attempt to prevent the DOS from uncovering the alleged scheme. Resolution of this factual issue must be left to the jury.[15]

Of course, this letter was not sent by the defendant. But Kerik is also alleged to have violated 18 U.S.C. § 2 under the mail fraud charge in the Superseding Indictment. That statute states, in relevant part, that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b). Count Two alleges that Kerik, "for the purpose of executing [the honest services fraud] scheme . . . *caused* matters and things to be delivered by mail according to the directions thereon, to wit, correspondence, invoices, *prequalification and background forms*, and bidding documents." Sup. Indict. ¶ 22 (emphasis supplied). Because the Court assumes that

---

[15] Similarly, the factual question of whether the questionnaire contains any misrepresentations—Kerik arguably did not violate any of his "*official* acts, duties or decisions," *see* Def. Reply Mem., p. 9 n.3; *see also* note 6, *supra*—is also better suited for the jury.

all allegations made in the Superseding Indictment are true, the Government has properly alleged that the mailing is attributable to Kerik under 18 U.S.C. § 2. Kerik's motion to dismiss Count Two as untimely is therefore denied.

### iii. Count Three—Wire Fraud

In support of the timeliness of Count Three, the Government offers a facsimile transmission, dated December 30, 2004, from Kerik to the contractor responsible for the renovations to his Riverdale apartment. *See* Opp., Gov't Exh. G.[16] The Government similarly contends that this fax—unquestionably sent within the limitations period—constitutes a "lulling letter" in furtherance of the honest services fraud scheme. Opp., p. 30.

The Government's attempt to classify the December 2004 fax as a "lulling letter" is unpersuasive. As noted above, so-called "lulling letters" are designed to lull a victim into a false sense of security and to convince him that no crime is afoot. *Lane*, 474 U.S. at 452. That simply is not the case here. First, the fax was not sent to a victim; rather it was directed at a "critical witness" and, in the Government's own characterization, it was designed to plant a false statement with that witness. Second, and more important, at the time this fax was sent, Kerik was under investigation by the Bronx District Attorney and the New York Department of Investigation. Once that investigation began, it is implausible to argue that Kerik was "lulling" his victims to avoid the discovery of the alleged crime.

In *United States v. Victor Teicher & Co.*, the defendant was charged with wire fraud for placing a phone call during which he asked another employee to "destroy a page from [his] desk calendar." 726 F. Supp. at 1435. The court rejected the government's argument that the call

---

[16] The Government maintained in its briefs and at oral argument that it has not made a full proffer of the evidence it intends to submit at trial. Opp., pp. 27-28. However, the Government was on notice that the defendant moved to dismiss Counts One, Two, and Three on statute of limitations grounds. The Government had ample opportunity to proffer any evidence it desired to defeat Kerik's defense. The Court has considered all evidence offered by the Government and must decide the pending motion on the record developed by the parties.

constituted a "lull" and dismissed the wire fraud charge because the phone call was placed after

the scheme "had already ended and been discovered by the [investigators]." *Id.* Therefore, the

court held, the call could not have been "for the purpose of executing the scheme to defraud . . .

but rather [it] was an effort to cover up [the defendant's] participation in that very scheme . . . ."

*Id.* Like the defendant in *Victor Teicher*, Kerik may have been attempting to cover-up his

wrongdoing and obstruct justice, but those acts constitute separate crimes with which Kerik has

not been charged in this indictment.[17]

### c.   False Statement Claims

Generally, 18 U.S.C. § 1001 criminalizes false statements made in any matter within

federal jurisdiction.[18]  "It is well established that this section encompasses within its proscription

two distinct offenses, concealment of a material fact and false representation." *United States v.*

*Diogo*, 320 F.2d 898, 902 (2d Cir. 1963).  Where a question is so vague as to be fundamentally

---

[17] *United States v. Elkin*, 731 F.2d 1005 (2d Cir. 1984), *overruled on other grounds*, *United States v. Knoll*, 116 F.3d 994 (2d Cir. 1997), is not contrary.  In *Elkin*, the defendant was accused of defrauding the Department of Defense by claiming payment for work purportedly performed on the DOD's behalf.  After the defendant's company defaulted on the contract, the DOD never received any of the valves it had contracted to buy from the defendant. In the course of investigating whether the defendant was entitled to keep the progress payment, the DOD requested proof that the defendant's subcontractor had been paid for manufacturing the parts in question.  Elkin supplied his attorney with a letter—later mailed to the DOD—that gave assurances that the subcontractor had been paid.  The court found that the letter was proven false and that the letter was "a necessary step in executing the scheme because it was designed to lull the Department of Defense into believing that the progress payment had been properly made." 731 F.2d at 1008 (internal quotation marks and citations omitted).  Unlike the letter in *Elkin*, the Kerik's fax was not directed at his victim, and it was transmitted only after officials were investigating Kerik's wrongful conduct.  Although the line between lulling and covering-up may not be clearly demarcated, the Court nevertheless determines that no reasonable juror could find that Kerik's fax was sent in furtherance of the alleged scheme to defraud.

[18] 18 U.S.C. § 1001 provides, in pertinent part:

(a)  Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

   (1)  falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

   (2)  makes any materially false, fictitious, or fraudulent statement or representation; or

   (3)  makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or . . . both.

ambiguous, however, it cannot be the predicate of a false statement, regardless of the answer

given. *Cf. United States v. Watts*, 72 F. Supp. 2d 106, 109 (E.D.N.Y. 1999) (an answer to a

fundamentally ambiguous question "may not, as a matter of law, form the basis of a prosecution

for perjury or false statement" under 18 U.S.C. § 1014). This proscription holds even where the

answer is unquestionably false or fraudulent. The determination of fundamental ambiguity is a

question of law. *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986).

In this Circuit, "[a] question is fundamentally ambiguous when it 'is not a phrase with a

meaning about which men of ordinary intellect could agree, nor one which could be used with

mutual understanding by a questioner and answerer unless it were defined at the time it were

sought and offered as testimony.'" *Lighte*, 782 F.2d at 375 (quoting *United States v. Lattimore*,

127 F. Supp. 405, 410 (D.D.C. 1955)). Of course, "to precisely define the point at which a

question becomes fundamentally ambiguous, and thus not amenable to jury interpretation, is

impossible." *United States v. Farmer*, 137 F.3d 1265, 1269 (10th Cir. 1998).

Kerik argues that Count Twelve and the first question underlying Count Fourteen should

be dismissed because each is based on impermissibly ambiguous questions. These Counts

generally charge Kerik's failure to disclose information (including his association with XYZ)

that might be embarrassing to him, his family, or the President of the United States, in violation

of 18 U.S.C. § 1001.[19] Kerik argues that the veracity of his answers to questions about

---

[19] Count Twelve includes three alleged misrepresentations that Kerik supplied to federal officials while seeking memberships in the Academe & Policy Research Senior Advisory Committee to the White House Office of Homeland Security. Specifically, on October 29, 2002, when asked whether there was anything embarrassing that he [Kerik] wouldn't want the public to know about, Kerik told a White House official, "Nope! It's all in my book." Subsequently, on December 19, 2002, Kerik responded to a Personal Data Statement Questionnaire from the Office of Counsel to the President. In his responses, when asked whether he or his spouse ever had any association with any person, group, or business venture that could be used, even unfairly, to impugn or attack his character and qualifications for a government position, Kerik stated, "No questionable business affiliations." Similarly, when asked whether there was any other information, including information about other members of his family, that could be considered a possible source of embarrassment to him, his family, or the President, Kerik stated, "Not to my knowledge." Sup. Indict. ¶ 45 (accompanying chart).

"embarrassment" cannot, as a matter of law, be assessed objectively. Such a determination, Kerik reasons, would require the jury to grapple with how he understood the questions that prompted his responses.[20]

In response, the Government disputes Kerik's characterization that the questions in Counts Twelve and Fourteen are fundamentally ambiguous. The Government contends that the questions can be understood by looking at the context of the examination and the questioner, and it notes that such questions are routinely asked of prospective executive branch employees. In this case, the Government argues, the jury should be charged "to determine the reasonable meaning of the relevant question and the truthfulness of the defendant's response." Opp., pp. 65-66.

At the outset, the Court notes that only questions one and three from Count Twelve employ the term "embarrassing". After considering the factors set forth in *Lighte*, the Court concludes that the remaining false statement charges in the Superseding Indictment are permissible. In Count Fourteen Kerik was specifically asked about his relationships with John Doe #3 and XYZ and whether those relationships might raise any concern for the President. The question explicitly directs Kerik's attention to John Doe #3 and XYZ, leaving little, if any, ambiguity in the scope of the inquiry.[21] Similarly, question two from Count Twelve focuses on

---

Question one from Count Fourteen was asked while Kerik was being considered for the position of Secretary of the United States Department of Homeland Security in late 2004. Sup. Indict. ¶ 50. When asked whether there was any possible concern the President should have about Kerik's relationship with John Doe #3 or XYZ, Kerik told a White House official that there was none. Sup. Indict. ¶ 51 (accompanying chart).

[20] Insofar as Kerik argues that submission of these Counts to the jury is impermissible because the jury must surmise Kerik's subjective understanding of the questions, that argument is foreclosed by *Lighte*. 782 F.2d at 372 ("How a defendant interprets a question obviously is not viewed subjectively, as that would compel the jury to accept as conclusive the meaning a defendant alleges he gave to the stated question, and no perjury prosecutions would ever result in convictions. The test is therefore an objective one. The jury should determine whether the question—as the declarant must have understood it, giving it a reasonable reading—was falsely answered.").

[21] Alternatively, Kerik argues that this charge should be dismissed because the question required him to engage in speculation (*i.e.*, to ask himself what might embarrass the President). Speculation, Kerik argues, cannot be proven false, and therefore cannot constitute the basis for a false statement. Here, Kerik reaches too far. The speculation,

-20-

personal or business associations that might be used to impugn or attack Kerik's character and

qualifications for a government position. While not as specific as question one from Count

Fourteen, this query limits the scope of Kerik's answer to "associations" that might impugn his

character or qualification. Such questions are not impermissibly vague.

Plainly the meaning of the term "embarrassing", at least as used in the Superseding

Indictment, is open to interpretation. What is embarrassing to one person may not be

embarrassing to the next. If an individual withheld some innocuous but potentially embarrassing

secret—such as one's contentious divorce or one's prescription medication—it is hard to believe

that a federal prosecution would follow. But prosecutorial discretion is not the question here.

The salient question—and it is a close one—is whether these questions are sufficiently clear to

be placed before a jury.

Helpfully, the same objection Kerik now asserts was raised by the defendant in *United*

*States v. Cisneros*, 26 F. Supp. 2d 24 (D.D.C. 1998). Henry Cisneros, the former Secretary of

Housing and Urban Development, was indicted for making false statements to federal officials in

connection with his nomination to the cabinet post. When Cisneros was asked whether there was

"anything" in his "personal life that could be used by someone to coerce or blackmail" him and

whether there was anything "that could cause an embarrassment to [him] or to the President if

publicly known," Cisneros replied that "that there was no basis upon which he would be subject

to coercion or blackmail." 26 F. Supp. 2d at 32, 41. At that time, Cisneros was allegedly

making payments to his former mistress in order to ensure her public silence about the

extramarital affair and his previous payments to her. *Id.* at 32. Cisneros moved to dismiss the

---

if any, is slight, and a juror can reasonably assess what Kerik was (or should have been) thinking about when
answering whether his associations with John Doe #3 and XYZ might bring embarrassment to the President. The
case law Kerik cites, involving a respondent's answers to *hypothetical* questions, is not apposite or persuasive in
the context of speculative questioning. *See United States v. Carey*, 152 F. Supp. 2d 415, 424 (S.D.N.Y. 2001).

false statement charge because the terms "coerce," "blackmail," and "embarrassment" were vague and ambiguous. The district court declined to dismiss the charges for vagueness, holding that "[t]he meaning of Cisneros' statements is a matter that is within the province of a jury to determine." *Id.* at 42.[22]

Considering the guidance from *Cisneros*, this Court agrees that the term "embarrassing" is not fundamentally ambiguous *per se*. For example, a question about "embarrassing educational history" or "embarrassing business dealings" would not be fundamentally ambiguous because it provides the answerer with clarity about the specific information sought by his examiner. Moreover, in the context in which questions were asked of Kerik—the vetting process for a high-level executive position—the participants shared a mutual understanding that the questioner sought general information that might be publicly and politically damaging to the nominee or the President. *See Lighte*, 782 F.2d at 373 ("The jury may also consider extrinsic evidence that demonstrates how a declarant interpreted a question."). Nevertheless, as a question becomes more abstract, such mutual understanding becomes more tenuous and ambiguity swells.

With these principles in mind, the Court is troubled by questions one and three from Count Twelve. On October 29, 2002, Kerik was asked whether there was anything embarrassing that he would not want the public to know about. In contrast to the questions above, this level of abstraction renders the term "embarrassing" fundamentally ambiguous. The question does not explicitly limit the context to "associations" or specific affiliations. Rather, the question is more

---

[22] Kerik's approach to distinguishing *Cisneros* is unpersuasive. Kerik argues that the *Cisneros* court did not have occasion to address the ambiguity of the question because Cisneros's answer—"that there was no basis upon which he would be subject to coercion or blackmail"—could be analyzed irrespective of the question that prompted it. But even if Kerik's characterization is correct, it does not follow that the court did not consider the ambiguity inherent in the question posed. Indeed, Cisneros's objection was directed at the ambiguity of the question and, as explained above, the veracity of an answer is inconsequential when responding to a fundamentally ambiguous question. Therefore, this Court has no reason to believe that the *Cisneros* court failed to consider whether the term "embarrassing" was fundamentally ambiguous.

like a fishing expedition, seeking *anything* that might embarrass an applicant. Despite the laundry list of answers the Government wishes Kerik would have supplied, it does not follow that Kerik necessarily understood the question in precisely this way.[23] Question three from Count Twelve provides no greater clarity. Thus, the Court finds that these two questions are fundamentally ambiguous and may not serve as predicates for the false statement charges in the Superseding Indictment.[24]

### d. Misjoinder Under Rule 8(a)

The Federal Rules of Criminal Procedure allow for the joinder, in one indictment, of two or more offenses that are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." FED. R. CRIM. P. 8(a); *United States v. Stewart*, 433 F.3d 273, 314 (2d Cir. 2006) (joined offenses may be "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme") (internal quotation marks omitted). In reviewing the propriety of joinder, courts "apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper

---

[23] To give a complete and truthful answer to this question, the Government argues that Kerik should have disclosed: "(1) his relationship with John Doe #1, John Doe #2, and John Doe #3; (2) the secret, illicit benefits he received from John Doe #1, John Doe #2, and XYZ; (3) the fact that he failed to disclose those benefits as required on financial disclosure forms he was required to file with the City and that he had committed a crime by failing to make those disclosures on those forms; (4) the steps he took as a public official on behalf of John Doe #1, John Doe #2, and XYZ with City regulators; (5) the fact that he had failed to disclose the loan he had received from John Doe #6 on financial disclosure forms he was required to file with the City and that he had committed a crime by failing to make that disclosure on those forms; (6) the fact that he had filed a false loan application with a federally insured bank wherein he had made several false statements relating to the John Doe #6 loan and that he had committed a crime by doing so; and (7) the fact that he had committed federal income tax fraud in connection with the preparation, subscription, and filing of his 2000 and 2001 tax returns." Opp., p. 59.

[24] The Court acknowledges that the charges in Count Twelve are strikingly similar to those questions permitted in *Cisneros. See* 26 F. Supp. 2d at 45 ("Is there anything in your personal life that could be used by someone to coerce or blackmail you? Is there anything in your life that could cause an embarrassment to you or to the President if publicly known? Is so, please provide full details."). Nevertheless, resolution of this issue must be done on a case-by-case basis. The *Cisneros* court spent the overwhelming bulk of its analysis on the terms "coerce" and "blackmail", and rightly so given the facts of that case. However, the false statement charges against Kerik are cloaked only in terms of "embarrassment", and, absent any further clarifying context, those questions are impermissible as a matter of law.

notwithstanding the possibility of prejudice to . . . the defendant[] resulting from the joinder."
*United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2007) (internal quotation marks omitted).
"[C]ounts might be 'connected' if one of the offenses 'depends upon or necessarily leads to the
commission of the other,' or if proof of one act 'constitutes or depends upon proof of the other.'"
*Id.* (quoting *United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978)) (internal stylistic changes
omitted).

 As the beginning of this Opinion and Order makes clear, the Government has cobbled
together in the Superseding Indictment a laundry list of illegal schemes and false statements
made over the span of eight years. The charges are not related to all others by time, actors,
places, or subject matter. The lone common link is Kerik himself, like an unpleasant episode of
*This Is Your Life*. Nevertheless, the Government argues that joinder is appropriate because the
charges all involve similar kinds of "substantially alleged dishonesty." *See United States v. Ruiz*,
894 F.2d 501, 505 (2d Cir. 1990).[25] Relying on Rule 8's "similar character" prong, the
Government categorizes the charges as falling into two types of crimes: (1) a species of fraud or
(2) a species of false statement. Opp., p. 73. But beyond the broad mantra of "dishonesty,"
Kerik's alleged conspiracy to defraud New York citizens of his honest services has nothing to do
with, for example, his alleged failure to withhold payroll taxes from his nanny. Indeed, the fact
that the Government needed 27 pages in its brief to string together the charges highlights the
tenuous relationship between counts in the Superseding Indictment.

---

[25] In *Ruiz*, the court held that the false statement and perjury charges were "part of a common scheme or plan," and
then noted that because "as all involved substantial alleged dishonesty, surely they were 'of the same or similar
character.'" 894 F.2d at 505. The Government cites this latter phrase throughout its memorandum of law, but this
horse can be ridden only so far. The charges joined in *Ruiz* were more closely related than those here. Ruiz, a
state senator, was charged with perjury and false statements on a loan application and all facts in that indictment
arose out of his extra-senatorial business dealings with a non-profit company called Alliance for Progress, Inc. As
another court clarified, "[i]n *Ruiz*, the counts were connected because they all related either to his consulting for
or investing in Alliance or to his attempt to conceal the fact that those activities might be illegal." *United States v.
Bezmalinovic*, No. S3 96 Cr. 97, 1996 WL 737037, at *4 (S.D.N.Y. Dec. 26, 1996).

Neither the Government's "daisy chain" of charges—linking one offense to the next, through common laws or facts, until all charges are included—nor its broad motif of "similar kinds of substantially alleged dishonesty" is sufficient to attain joinder of these charges. *See Shellef*, 507 F.3d at 100 ("We do not think, then, that the 1999 Tax Count—which might have been joined with *either* the 1996 Tax Counts *or* the [non-tax] counts—provides an adequate link between the 1996 Tax Counts and the non-tax counts to justify joinder of all the charges against Shellef."); *see also United States v. Buchanan*, 930 F. Supp. 657, 662 (D. Mass. 1996) ("A vague thematic connection among offenses may not support joinder. The government cannot link cases simply be changing the level of abstraction—namely that this case is about an abuse of trust, rather than about two distinct allegedly illegal schemes."); *United States v. Bezmalinovic*, No. S3 96 Cr. 97, 1996 WL 737037, at *3 (S.D.N.Y. Dec. 26, 1996) ("The government's broad argument that in all the offenses charged, Bezmalinovic used fraud to achieve his goal of obtaining money, is true of a great number of crimes, not all of which are of a 'similar character' to each other within the meaning of Rule 8(a)."). The Government's other arguments in support of joinder are similarly unavailing.

Even if joinder were otherwise proper, Kerik would be entitled to severance under Rule 14. When totally unrelated offenses are joined, a defendant faces a considerable risk of substantial prejudice. For example, in opposing the present motion, the Government characterized Kerik's activities as "*an extensive crime spree*, one that lasted from in or about 1998 until 2006 when [Kerik] ultimately pleaded guilty to related charges in state court that encompassed official corruption, tax fraud, and a web of repeated lies and deceit." Opp., pp. 1-2 (emphasis supplied). Frankly, that is a reasonable implication from the fifteen-count Superseding Indictment, and the suggestion of some "criminal disposition" by Kerik would

result in impermissible prejudice requiring severance. Thus, the Court concludes that the Superseding Indictment suffers from misjoinder, and, in the alternative, prejudicial joinder.

Unmistakably, honest services fraud is the anchor charge in the Superseding Indictment. All other counts that share a similar character, or are based on the same act or transactions, or are connected with or constitute parts of a common scheme or plan to commit honest services fraud are properly joined. *See Shellef*, 507 F.3d at 87-88 ("Joinder of tax charges with non-tax charges under Rule 8 is therefore permissible if 'the tax offenses arose directly from the other offenses charged,' such as when the funds derived from the acts underlying the non-tax charges 'either are or produce the unreported income' that is the basis for the tax charges.") (quoting *United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988)); *United States v. Bibby*, 752 F.2d 1116, 1121 (6th Cir. 1985) (finding that tax charges unrelated to conspiracy charge were misjoined, even though other tax charges relating to the conspiracy were proper joined). Specifically, the following charges may be joined: Count One, Count Two, paragraph 29(a) from Count Four, Count Five, Count Twelve, Count Fourteen, and Count Fifteen.[26] The remaining counts may be brought in a separate proceeding.[27]

---

[26] Furthermore, Kerik's application to sever Counts Fourteen and Fifteen from this prosecution is granted on venue grounds. Those charges may be filed in the appropriate forum, namely the District of Columbia.

[27] Before releasing this written opinion, the Court announced its rulings from the bench on March 23, 2009. The Government subsequently sought reconsideration of the Court's decision to sever Count Ten from the remaining charges. The Court granted the parties permission to brief this discrete issue prior to the publication of this opinion. The applicable standard for a reconsideration motion in a criminal case is the same as the civil standard under Rule 6.3 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York. *United States v. Yannotti*, 457 F. Supp. 2d 385, 388-89 (S.D.N.Y. 2006). Having considered the parties' submissions, the Government's motion for reconsideration is denied. The Government's second presentation—though more focused and persuasive than its argument on pages 94 and 95 of the original opposition brief—raises neither matters nor controlling decisions which the Court overlooked in reaching its initial disposition. The reconsideration brief was simply more compelling. But "[w]here the movant fails to show that any controlling authority or facts have actually been overlooked, and merely offers substantially the same arguments he offered on the original motion . . . the motion for reconsideration must be denied." *Mikol v. Barnhart*, 554 F. Supp. 2d 498, 500 (S.D.N.Y. 2008). Disagreement with this Court's ruling is the basis for appeal, but not for reconsideration. *Faulkner v. National Geographic Soc'y*, 296 F. Supp. 2d 488, 490 (S.D.N.Y. 2003).

### e. Other Discovery Requests

Kerik seeks additional discovery and an evidentiary hearing related to the Government's interactions with his former attorney, Mr. Tacopina. However, Kerik has failed to identify, or even allege, new evidence that the Government engaged in some impermissible practice which might warrant further discovery (*e.g.*, asking Mr. Tacopina to disclose privileged client confidences). Consequently, Kerik's request for supplemental discovery is denied for the reasons set forth in this Court's Memorandum Decision and Order dated January 23, 2008. *United States v. Kerik*, 531 F. Supp. 2d 610, 617-18 (S.D.N.Y. 2008).

Kerik also requests that the Government provide a full bill of particulars under Rule 7(f).[28] The decision to grant a bill of particulars rests within the "sound discretion of the district court," *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988), and, as this Court noted in *United States v. Ordaz-Gallardo*, 520 F. Supp. 2d 516 (S.D.N.Y. 2007), "[a] bill of particulars is not an investigative tool, or a tool of discovery, but rather is meant to apprise the defendant of the essential facts of a crime and should be required only where the charges of an indictment are so general that they do not advise a defendant of the specific acts of which he is accused." 520 F. Supp. 2d at 521-22 (internal quotation marks omitted). As the defendant must concede, the particularity of charges against Kerik improved in the Superseding Indictment, and, in the Court's view, the Government has given Kerik all the details he needs to prepare for trial, subject to its *Brady*, *Giglio*, and section 3500 disclosures due at a later date. "The prosecution need not particularize all of its evidence." *Davidoff*, 845 F.2d at 1154. Therefore, Kerik's request for a bill of particulars is denied, although the Court will entertain a subsequent request for particulars upon a greater showing from the defendant.

---

[28] Specifically, Kerik seeks particulars on the "concealment" allegations in paragraph 20 of Count One. *See* Mem., pp. 80-81. As noted above, the Court declined to address in dicta the legal sufficiency of these allegations in the Superseding Indictment. *See* note 13, *supra*.

## III.    Conclusion

For the reasons set forth in this Opinion and Order, the Court holds:

1. The defendant's motion to dismiss Counts One, Two, and Three for failure to state a claim for honest services fraud is denied.

2. The defendant's motion to dismiss Count One (Conspiracy) as barred by the statute of limitations is denied.

3. The defendant's motion to dismiss Count Two (Mail Fraud) as barred by the statute of limitations is denied.

4. The defendant's motion to dismiss Count Three (Wire Fraud) as barred by the statute of limitations is granted.

5. The defendant's motion to dismiss Count Twelve and question one from Count Fourteen is granted in part and denied in part.  Specifically, questions one and three from Count Twelve are based on fundamentally ambiguous questions and are dismissed.  Question two from Count Twelve and question one from Count Fourteen may serve as predicates for the false statement charges.

6. The defendant's motion for severance is granted.  Count One, Count Two, paragraph 29(a) from Count Four, Count Five, Count Twelve, Count Fourteen, and Count Fifteen may be joined.  Moreover, the defendant's motion to sever Counts Fourteen and Fifteen on venue grounds is granted.  The Government's motion for reconsideration of severance of Count Ten is denied.

7. The defendant's remaining requests for additional discovery are denied.

*It is so ordered.*

Dated: White Plains, New York

_May 13_____, 2009

Stephen C. Robinson
United States District Judge

# EXHIBIT D

# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
666 FIFTH AVENUE, 31ST FLOOR
NEW YORK, NEW YORK 10103-3198
WWW.FULBRIGHT.COM

KBREEN@FULBRIGHT.COM
DIRECT DIAL: (212) 318-3340

TELEPHONE:   (212) 318-3000
FACSIMILE:   (212) 318-3400

March 21, 2007

**CONFIDENTIAL**

**BY ELECTRONIC AND OVERNIGHT MAIL**

Perry A. Carbone
Assistant United States Attorney
Criminal Division, Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Re:   Bernard Kerik

Dear Mr. Carbone:

As you know, we represent Bernard Kerik in connection with your office's criminal investigation of him. We write to (1) advise that Mr. Kerik intends to preserve his attorney work product protections and attorney-client privilege as to his discussions and other communications with his past and present attorneys, including Joseph Tacopina [REDACTED] and (2) inquire as to the protections that you have put in place to remedy any past, and to prevent any future, intrusion upon privilege in the course of your investigation.

Our concern stems from your receipt of attorney-client communications that had been intercepted and your efforts to gather other potentially privileged information. With regard to the privileged information that you have gathered already, we demand an immediate, detailed accounting of this information and a description of your efforts to gather the information.

Specifically, we are aware that you obtained from the Bronx District Attorney's Office tape recordings of conversations between Messrs. Kerik and Tacopina, which were made pursuant to a wiretap obtained by the Bronx District Attorney's Office from approximately July 13, 2005 through September 9, 2005. Review of the transcript of the only such call that was provided to us by the Bronx District Attorney's Office reveals that privileged conversations were recorded.

We understand now that you have tapes of other such attorney calls as well. Thus far, you have refused our oral request that you provide us with copies of the other tapes or transcripts of attorney calls. We again request all tapes and transcripts of such calls so that we can make an

Perry A. Carbone                                                    CONFIDENTIAL
March 21, 2007
Page 2

assessment of the extent to which Mr. Kerik's attorney-client privilege and attorney work product protections have already been compromised, and seek appropriate relief.

In addition, we ask for a description of the protections that have been implemented to date to prevent the disclosure of privileged information to other prosecutors or case agents working on the investigation. As explained at length below, any use of privileged information in the investigation would violate Mr. Kerik's rights and implicate remedies ranging from exclusion of evidence to dismissal of any indictment that you might decide to bring.[1]



A.      The Intercepted Communications Contain Privileged Communications

The attorney-client privilege, recognized as "the oldest of the privileges for confidential communications known to the common law," Upjohn Co. v. United States, 449 U.S. 383, 389 (1981), serves "to promote unfettered communication between attorneys and their clients so that the attorney may give fully informed legal advice." In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995) (citation omitted). The privilege applies

> (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.

Id. at 39 (citation omitted).

The attorney work product doctrine "serves a similar purpose: 'to avoid chilling attorneys in developing materials to aid them in giving legal advice and in preparing a case for trial.'" Id. (citation omitted). The protection extends to any documents or things prepared in anticipation of litigation "by or for a party, or by or for his representative." SEC v. Beacon Hill Asset, Mgt, LLC, 2004 WL 1746790, at *4 (S.D.N.Y. August 3, 2004) (internal quotation marks and citation omitted). In addition, the attorney work product protection can apply to oral communications. See, e.g., Clute v. The Davenport Co., 118 F.R.D. 312, 315 (D. Conn. 1998) (noting that the work product doctrine applies to the contents of oral interviews).

We understand that you have the transcripts of discussions to which Mr. Tacopina was a party, at a time when Mr. Tacopina was acting as Mr. Kerik's attorney, and that these discussions were for the purpose of seeking legal advice. We understand that throughout the time of the

---

[1] In addition, the privileged communications could be suppressed on the separate ground that their interception was in breach of the minimization requirement. See 18 U.S.C. § 2518(8).

31296339.2

Perry A. Carbone                                                         CONFIDENTIAL
March 21, 2007
Page 3

interceptions, Mr. Kerik was known to be the subject of an investigation at least by the Bronx
District Attorney's Office. As a result, any such discussions would therefore have been made "in
anticipation of litigation," and therefore would be subject to the attorney work product
protection. In re Grand Jury Proceedings, 2001 U.S. Dist. LEXIS 15646, at *48 (S.D.N.Y. Oct.
3, 2001) ("A lawsuit need not already have been filed for the 'in anticipation of litigation'
requirement to be met. Thus, a document may be protected even if it was 'created prior to the
event giving rise to litigation' because 'in many instances, the expected litigation is quite
concrete, notwithstanding that the events giving rise to it have not yet occurred'") (citation
omitted). It is immaterial whether the material at issue was created in anticipation of another
litigation, so long as it was created in anticipation of some litigation. See Fine v. Facet
Aerospace Prods. Co., 133 F.R.D. 439, 445 (S.D.N.Y. 1990).

B.      The Crime-Fraud Exception is Narrowly Construed and Cannot Apply Here

        The crime-fraud exception "applies only when there is probable cause to believe that the
communications were intended in some way to facilitate or to conceal the criminal activity." In
re Grand Jury Subpoena Duces Tecum, 798 F.2d 32, 34 (2d Cir. 1986) (citation omitted). Thus,
even where there is probable cause to believe that a crime has been committed, the government
must also establish probable cause to believe "that the communications were in furtherance of"
the criminal activity. In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995) (emphasis supplied).
It is therefore insufficient to show that the attorney-client communications overlapped
temporally with criminal activity. In re Grand Jury Subpoena Duces Tecum, 798 F.2d at 34.
Even the fact that the attorney-client communications provide evidence of the criminal conduct
is insufficient. In re Richard Roe, Inc., 68 F.3d at 40.

        Rather, the exception will apply "only when the court determines that the client
communication or attorney work product in question was itself in furtherance of the crime or
fraud." Id. (citing In re Grand Jury Subpoena Duces Tecum, 798 F.2d at 34) (emphasis in
original). In addition, the exception applies only to individual communications, not to a class of
communications: "the crime-fraud exception applies only where there is probable cause to
believe that the particular communication with counsel or attorney work product was intended in
some way to facilitate or to conceal the criminal activity." Id. (citing In re Grand Jury Subpoena
Duces Tecum, 798 F.2d at 34)) (emphasis supplied). For these reasons, courts routinely reject
assertions that the crime-fraud exception applies. See, e.g., United States v. Stewart, 2003 U.S.
Dist. LEXIS 23180, at **4-6 (S.D.N.Y. Dec. 29, 2003) (denying a government application for
subpoena where the government failed to make an adequate showing of the need for privileged
documents prepared during the government's pre-indictment investigation, and holding that the
crime-fraud exception does not apply "simply because privileged communications would provide
an adversary with evidence of a crime or fraud"); In re Currency Conversion Fee Antitrust
Litigation, 2002 U.S. Dist. LEXIS 21196, at **13-14 (S.D.N.Y. Nov. 1, 2002) (holding that the
crime-fraud exception did not apply to a privileged attorney memorandum advising a client on
the legality of possible courses of conduct); North River Ins. Co. v. Columbia Casualty Co., 1995
U.S. Dist. LEXIS 7956, at **13-15 (S.D.N.Y. May 31, 1995) (holding that the crime-fraud
exception did not apply where the excerpts from privileged communications cited by the party

31296339.2

Perry A. Carbone                                                    CONFIDENTIAL
March 21, 2007
Page 4

seeking disclosure did not show an ongoing fraudulent scheme, but instead reflected "the balancing of potential rights and liabilities that typically characterize attorney-client communications").

Here, there does not appear to be any basis for application of the crime-fraud exception. We are unaware of any evidence that Mr. Kerik sought out Mr. Tacopina's advice for the purpose of furthering or concealing any criminal conduct, and our review of the transcript made available to us has confirmed this view.

C.    The Interception and Review of Privileged Discussions Implicates Mr. Kerik's Rights

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended ("Title III") requires those monitoring intercepted communications to 'minimize' the interception of privileged communications. See 18 U.S.C. § 2518(8). Moreover, the statute expressly provides that privileged communications remain privileged, despite their interception:

> No otherwise privileged wire, oral, or electronic communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character.

18 U.S.C. § 2517(4). See United States v. Arreguin, 277 F. Supp. 2d 1057, 1062 (E.D. Cal. 2003) ("Indeed, Congress took deliberate action to preserve the privilege where privileged communications were intercepted.") (citing Section 2517(4)).

In light of these statutory commands, it is clear that (1) the interception of privileged communications between Mr. Kerik and Mr. Tacopina, or communications in which the substance of privileged discussions were disclosed, violated the minimization requirements of Title III; and (2) those communications remain privileged, despite the fact that they were intercepted.

Given the plainly protected nature of the communications that were intercepted, it is especially troubling that you seem to believe that even a 'taint team' procedure for reviewing the discussions is unnecessary. Your blanket assertion that no such procedure is necessary because the communications are subject to the crime-fraud exception overlooks the narrow scope of that exception. More important, it fails to ensure that the investigation is not tainted by the disclosure of privileged communications.

The government's review of privileged materials to determine if they fall within the scope of the 'crime-fraud' exception to the attorney-client privilege would constitute an intentional violation of the privilege. United States v. Neill, 952 F. Supp. 834, 840 (D.D.C. 1997) (holding that "there can be no doubt that the government intentionally invaded the attorney-client privilege" where a DOJ attorney "testified that she read most (but not all) of the potentially privileged materials to determine whether the crime-fraud exception applied"). In such a case, the government "bears the burden to rebut the presumption that tainted material was

31296339.2

Perry A. Carbone                                                    CONFIDENTIAL
March 21, 2007
Page 5

provided to the prosecution team." Neill, 952 F. Supp. at 840-41 (citing Briggs v. Goodwin, 698 F.2d 486, 496 n. 29 (D.C. Cir. 1983), vacated on other grounds, 712 F.2d 1444 (D.C. Cir. 1984)).

The courts afford broad remedies for the government's improper review of privileged communications. Courts will typically exclude from evidence not only the improperly reviewed privileged communications, but also all evidence derived therefrom. See United States v. Lin Lyn Trading, Ltd., 149 F.3d 1112, 1118 (10th Cir. 1998) (upholding the suppression of all evidence gathered after the date a privileged document was seized by the government).

Where the improper review is sufficiently egregious, dismissal of the indictment is appropriate. See United States v. Ginsberg, 758 F.2d 823, 833 (2d Cir. 1985) (noting that prejudice sufficient to warrant dismissal can be shown by establishing "that a prosecution witness testified concerning privileged communications, that prosecution evidence originated in such communication, or that such communications have been used in any other way to the detriment of the defendant"); United States v. Mackey, 405 F. Supp. 854, 866-67 (E.D.N.Y. 1975) (noting that when assessing whether to dismiss a facially valid indictment, court must assess the egregiousness of the violation, and the extent to which the defendant has been prejudiced).

D.     The Communications Should Be Reviewed Independently

As explained above, we are not aware of any facts that were in place here that would give rise to the narrowly circumscribed circumstances for the crime-fraud exception to apply. Thus, we request that your office submit to a judge or special master transcripts of all intercepted communications to which Mr. Tacopina was a party or in which communications with him were discussed.

We note that although courts have sanctioned the use of 'taint teams,' they have recognized that review by a judge or special master is the more proper mechanism. See, e.g., In re Grand Jury Subpoenas, 454 F.3d 511, 523 (6th Cir. 2006) (noting "an obvious flaw in the taint team procedure: the government's fox is left in charge of the appellants' henhouse, and may err by neglect or malice, as well as by honest differences of opinion"). Several judges in the Southern District have expressed similar concerns and have ordered that privilege reviews be conducted by judges or special masters. See United States v. Kaplan, 2003 WL 22880914, at *12 (S.D.N.Y. Dec. 5, 2003) (Batts, J.) ("Certainly this Opinion should be counted among those disapproving the Government's use of an ethical wall team to 'protect' the attorney-client and work-product privileges or to determine whether the crime-fraud exception applies, where potentially privileged materials are turned over to the trial team and case agents before any challenge to those determinations can be raised by a Defendant and determined by a court."); United States v. Stewart, 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002) (Koeltl, J.) (citing cases); In re Search Warrant for Law Offices Executed on March 19, 1992, 153 F.R.D. 55, 59 (S.D.N.Y. 1994) (Brient, J.) ("[T]his Court notes that reliance on the implementation of a Chinese Wall, especially in the context of a criminal prosecution, is highly questionable and should be discouraged. The appearance of Justice must be served, as well as the interests of Justice"). Indeed, it appears that your office has conceded the lack of precedent in the Southern

J1296330.2

Perry A. Carbone                                                    CONFIDENTIAL
March 21, 2007
Page 6

District reaching the opposite conclusion. See Stewart, 2002 WL 1300059, at *6 ("The government also concedes that it is unaware of any judicial decision in this District that has compared the relative merits of using a Special Master and using a government privilege team in these circumstances and has identified use of a privilege team as a better procedure.").

Furthermore, the guidance set out in the U.S. Attorneys' Manual ("USAM") for the review of materials seized from an attorney's office contemplates such independent review. See Stewart, 2002 WL 1300059, at *6 (noting that "the USAM clearly contemplates the possibility of review by a special master or judicial officer . . . ."). The section of the USAM concerning the search of the premises of subject attorneys provides that "[p]rocedures should be designed to ensure that privileged materials are not improperly viewed, seized or retained during the course of the search." USAM § 9-13.420(D). Where limited review of arguably privileged material is required, a privilege team should be designated. See USAM § 9-13.420(E). While the USAM contemplates the use of privilege teams for gathering documents, in any subsequent review, it directs prosecutors to consider the use of a special master. The USAM requires prosecutors to assess, among other factors, the following:

- Who will conduct the review, i.e., a privilege team, a judicial officer, or a special master.

- Whether all documents will be submitted to a judicial officer or special master or only those which a privilege team has determined to be arguably privileged or arguably subject to an exception to the privilege.

USAM § 9-13.420(F) (emphasis supplied).

Here, the circumstances weigh more heavily for review by a judge or special master than in the case of a typical search of an attorney's office. Here, the intercepted communications took place in the course of Mr. Tacopina's ongoing representation of Mr. Kerik in the very matters under investigation. Moreover, as explained at length above, the alleged basis for overcoming the privilege -- the crime-fraud exception -- is exceedingly narrow in scope. For all of these reasons, review by a judge or special master is essential to protect Mr. Kerik's privileges and to avoid a violation of his Sixth Amendment rights.

E.      There Has Been No Waiver of Any Privilege Claims

Any suggestion that Mr. Kerik has somehow 'waived' all privilege claims as to any of the intercepted conversations is completely unfounded. Mr. Kerik received materials relating to the wiretaps from the Bronx District Attorney's Office on June 30, 2006, in conjunction with his guilty plea in Bronx County Supreme Court. Those materials reflected that several hundred conversations had been captured. Although a transcript of part of one discussion involving Mr. Tacopina was included, the materials did not enumerate how many discussions involving Mr. Tacopina were captured, and no transcripts of any other such discussions were provided.

31296339.2

Perry A. Carbone                                                    CONFIDENTIAL
March 21, 2007
Page 7

Moreover, nothing in the materials that were disclosed revealed that the recordings had been provided to your office.  Although we later learned through media reports and subsequent discussions with your office that you had obtained tapes pertaining to REDACTED, it was only in our recent discussions that we learned that your office also had tapes of discussions involving Mr. Tacopina.

In any event, the details of the chronology are irrelevant.  Even if Mr. Kerik had been made aware on the date of disclosure of the tapes to your office that discussions involving Mr. Tacopina were among them, he would have been under no obligation to affirmatively assert privilege.  As explained above, Title III explicitly provides that privileged communications remain privileged, despite their interception.  18 U.S.C. § 2517(4).  Nothing in Title III suggests that a privileged communication "shall lose its privileged character" because of a party's failure to make a pre-indictment assertion of privilege.  Indeed, such a rule would eviscerate the statutory protection for privileged communications.

Title III, moreover, expressly provides that any aggrieved party who seeks to suppress evidence obtained in a wiretap may do so through a pretrial suppression motion.  Section 2518(10)(a) of Title 18 explicitly provides that suppression motions may be made "in any trial, hearing, or proceeding . . . .[,]" and it further provides that "[s]uch motion shall be made before the trial, hearing, or proceeding, unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion."  Id.  In light of the express provisions of Sections 2517(4) and 2518(10)(a), there is plainly no basis to infer that a party who learns through a media report and discussions that a prosecutor may be in possession of privileged communications, waives any privilege claims by not immediately notifying the prosecutor of his privilege claims.  Title III makes clear that all privilege claims are preserved up until the time of a pretrial suppression motion, or even later if the party "was not aware of the grounds of the motion."

F.      Tacopina Subpoena

We are also aware of a subpoena that you served on Mr. Tacopina's office for records.  We have requested from Mr. Tacopina the opportunity to review any records that he intends to produce in response to the subpoena so that Mr. Kerik may assert any applicable privileges, and we will inform your office immediately if we intend to make any such assertions.


REDACTED

Perry A. Carbone                                    CONFIDENTIAL
March 21, 2007
Page 8

REDACTED

Very truly yours,

Kenneth M. Breen

31296339.2

# EXHIBIT E

S1 07 cr 1027(ser)

February 16, 2010

The Honorable Stephen C. Robinson
United States District Court Judge
United States Courthouse
300 Quarropas Street
White Plains, NY 10601

Your Honor:

I am writing to express my sincere apologies to Your Honor, the City of New York and to our country.

I began my law enforcement career at the age of 18 when I joined the United States Army's Military Police Corps. I was rough and uneducated, but the challenges and discipline of the military instilled in me a drive and dedication to serve our country in a way that I can hardly explain, and it took me on a journey from the streets of Paterson, New Jersey to all but one continent. That 30 years of service in various military, paramilitary and law enforcement positions taught me discipline, honor, integrity, compassion and respect.

But as I fully recognize, and so deeply regret, on multiple occasions I lost sight of and betrayed some of these very same principles when I committed the crimes to which I have admitted and for which I will humbly stand before this Court for sentencing.

I acknowledge and accept responsibility for the dishonor that my violations of the criminal laws of this country have brought on me, my family, my supporters, the public positions I once held, and the office for which I was nominated. This country and other public officials helped me rise and achieve in life beyond my wildest dreams, and placed the greatest trust – the public trust – in me. I betrayed that trust, and the opportunities I was given, and I am deeply sorry for and genuinely ashamed of what I did.

After I withdrew from consideration to become Secretary of the U.S. Department of Homeland Security and the first investigation began, my career and my life quickly came to a crashing halt and for the past six years it has been nothing less than a torturous nightmare for me and my family. I know that it was my own actions, and the crimes I committed, that are to blame, and I and my family have already suffered enormously because of what I did. For the first time in my entire life I have looked to my faith to help me survive, to repent for my mistakes and to hold together my family, which has been devastated and borders destruction. If there is any good that has come out of all of this, it is that I have learned lessons that I believe will help others not make the same mistakes that I have, and if and when given an opportunity, I commit myself to do just that.

905 OLD MILL ROAD, FRANKLIN LAKES, NEW JERSEY 07417

To say that I am remorseful is far less than reality and in my eyes; there are no words to express that remorse, sorrow or shame for what I truly feel. I would give anything to take it all back, and can only hope and pray that I live long enough to help right the wrongs I have committed.

In closing Your Honor, I make no excuses and take full responsibility for the grave mistakes I have made. I swear to you I have learned from this and that I have become and will continue to become a better person because of it. I know that I must be punished, and ask only that you allow me to return to my family, and to start on a new path, as soon as possible.

Sincerely,

BERNARD B. KERIK